# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

BYRON WILSON,
Defendant and Appellant.

S087533

Los Angeles County Superior Court
BA164899

April 12, 2021

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Kruger, Groban, and Krause[*] concurred.

_____

[*]  Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Opinion of the Court by Cuéllar, J.

This automatic appeal follows from defendants Byron Wilson's and Aswad Pops's[1] 2000 convictions and death sentences for the murders of four men during the robbery of a Compton car wash. Wilson was found guilty of four counts of murder in violation of Penal Code[2] section 187, subdivision (a), four counts of second degree robbery in violation of section 211, and second degree commercial burglary in violation of section 459. The jury found true that Wilson was armed with, and personally and intentionally discharged, a firearm causing great bodily injury with regard to three of the murders in violation of sections 12022, subdivision (a)(1) and 12022.53, subdivisions (b)–(d). The jury also found true the robbery-murder, burglary-murder, and multiple-murder special circumstances in violation of section 190.2, subdivisions (a)(3) and (a)(17). The jury found Wilson had suffered a prior serious or violent felony conviction

---

[1]    Aswad Pops was pronounced dead at San Quentin State Prison on August 29, 2019. (California Department of Corrections and Rehabilitation, *News Releases* <https://www.cdcr.ca.gov/news/2019/08/30/condemned-inmates-death-investigated-as-a-suicide-2/> [as of Apr. 9, 2021]. All Internet citations in this opinion will be archived by year, docket number, and case name at <http://www.courts.ca.gov/ 38324.htm>.) The appeal was permanently abated as to Pops on February 11, 2020.

[2]    All further unspecified statutory references are to the Penal Code.

under section 667, subdivisions (a)(1) and (b) through (i). After a penalty trial, the jury returned a verdict of death.

Wilson contends that several errors occurred during the guilt and penalty phases of his trial. Because we see no merit to any of his claims, we affirm the judgment.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. Prosecution Case

##### a. Wheels 'N Stuff

On January 25, 1998, Super Bowl Sunday, Byron Wilson and Aswad Pops parked outside of the Wheels 'N Stuff car wash on Sportsman Drive in Compton. Christopher Williams and Charles "Spanky" Hurd operated the car wash, which had been open for several months.

Williams, Hurd, and other employees dealt marijuana from the car wash, a fact about which Wilson was aware. Williams testified that he and his coworkers "tend[ed] to smoke a lot of weed," and the car wash customers "would want us to sell [them] some of the weed we were smoking and from time to time we would." A soda vending machine was located inside the car wash, and sometimes marijuana was stored inside of it. The patrons and workers of the car wash, by and large, knew one another. Williams saw both patrons and workers of the car wash with large amounts of cash in their pockets. Williams testified that the car wash had no official employees, and Williams did not keep financial records. Williams explained that anyone who washed cars did so on a volunteer basis, and Williams made no money from car washing as Wheels 'N Stuff did not charge for washes, although donations were permitted. The business sporadically paid its workers, but they generally

earned money in tips.[3]  The $1,500 rent for the Wheels 'N Stuff location was paid from marijuana proceeds.

### b. *Williams*

Williams arrived at the car wash the morning of January 25, 1998, intending to invite his friends to his home for a Super Bowl party, and to obtain marijuana to smoke.  When he got out of his truck, he noticed a car parked directly beside the car wash with two people sitting low in the car's front seats.  Williams went into the car wash, where he saw Michael Hoard working behind the counter, from whom he obtained a small bag of marijuana.  He also saw two acquaintances, Shawn Potter and E.T., arriving as he was leaving.

As Williams was leaving he noticed the two people, both Black men, were still sitting in a car — "probably an eighty something Honda" — parked beside the car wash.  Because he routinely sold marijuana from the car wash, he assumed the two men were interested in buying some and asked them what they needed.  The passenger — who Williams later identified as Pops — replied they were interested in "sounds," which the driver — later identified as Wilson — confirmed; Williams directed them to a nearby store that sold car stereos.

Williams then left the Wheels 'N Stuff parking lot.  Later that day he received a call at his home from a friend who told him, "[H]ey man, as soon as you left the people you talked to went straight in there and killed everybody."  Williams returned to the car wash, which had already been cordoned off with police

---

[3]  The Wheels 'N Stuff owners permitted workers to retain tips for car washes, but asked that tips for larger services be shared with them.

tape. From there, he was taken to the Compton Police Department and interviewed. He described the men he had seen sitting in the Honda earlier, explaining that the driver had a lighter complexion than the passenger, and appeared to be a little older. He believed both men had short hair, although he described the driver as having worn a cap.

### c. *Bowie*

Randy Bowie, who washed cars at the Wheels 'N Stuff from time to time, walked to work the day of the shooting, arriving just as Williams was leaving. Bowie stopped to use the payphone right outside of the car wash, which was where he first saw the car parked next to the car wash. The driver was about six feet from where Bowie stood. Bowie identified the driver at trial as Wilson. While on the payphone, the passenger of the car — who Bowie identified at trial as Pops — raised what Bowie believed was a TEC-9 semiautomatic handgun, pointed it at him, and told him not to warn anyone. Pops then got out of the car, grabbed Bowie's collar, thrust the gun beneath Bowie's arm, and used him as a shield. The driver got out of the car while brandishing a gun, which Bowie believed was a nine-millimeter or Glock and held it to Bowie's back. The two men then marched Bowie into the car wash.

While Bowie was held at gunpoint by the payphone, Hurd drove up to the car wash. At the same time, Jessie Dunn arrived in his own car, an El Camino with chrome IROC rims. The custom 3-bar chrome IROC rims originally belonged to Hurd, who had them specially retrofitted for his El Camino. Because the rims were manufactured for use with a Camaro, Hurd had new holes drilled into them and added distinctive hardware. Dunn bought the El Camino from Hurd. Following the sale,

Dunn's girlfriend, Kimberly Thomas, noticed an oxidation spot on one of the rims, and Dunn planned to have the rim re-dipped in chrome to fix the imperfection.

Hurd and Dunn both entered the car wash building after Pops and Wilson marched Bowie inside. Once in the building, Pops and Wilson ordered everyone to get on the ground and not move. The men inside the building after Bowie and his assailants entered included Hurd and Dunn (who had walked in after Bowie), Potter and E.T. (who entered as Williams was leaving), and Hoard (who had been inside all along). Bowie was afraid that if he alerted Hurd and Dunn to Pops and Wilson's presence, he would be shot.

Pops and Wilson asked those inside the car wash where the money and "shit" were kept. They searched inside of the building, walking to the opposite side of the building away from where Bowie lay on the ground. Hurd was the only other person Bowie could see. Bowie heard a commotion, after which a room divider slid between him and the area where Wilson and Pops were searching. Seizing the opportunity, Bowie got up and ran from the building; as he ran, he heard a number of gunshots.

Bowie hid for some time not knowing whether he was being pursued, and ultimately ran into a storage facility where he asked an employee to call the police. He said his shop had been robbed and his friends may have been shot. Bowie, shaken by the events, asked an employee of the storage facility to drive him to his brother's house. The employee agreed, and as they drove they passed the car wash, where Bowie saw police arriving.

While heading toward his brother's house, Bowie saw his brother's car turn into a parking lot, and Bowie asked the driver

to go there instead. Bowie, shaking so badly he could hardly stand, got into his brother's car. Now a passenger in his brother's car, Bowie again drove past the Wheels 'N Stuff where he saw the car wash taped off and a large crowd gathered. Bowie was still very frightened, and he did not want to stop or speak with police. He did not report that he witnessed the crime until the next day.

Bowie was interviewed by Detective Cat Chavers of the Compton Police Department. He told Detective Chavers about what he had witnessed and gave descriptions of the Honda's driver and passenger. He described the passenger as darker skinned than the driver, with braided hair curled up at the ends. He believed the passenger was between 25 and 30 years old and described him as wearing dark clothing and having a TEC-9 gun with a long clip. Bowie described the driver as lighter skinned and smaller than the passenger. Bowie "guess[ed]" the driver's age to be between 25 and 30; in fact, Wilson was 20 years old at the time of the shooting. Bowie told Detective Chavers he thought Wilson had a uniquely shaped mouth, and was able to identify Wilson on February 23, 1998, from a photographic lineup based on what he described to be "the smirky grin on his face."[4]

### d. Brown

Anthony Brown's testimony from the preliminary hearing was read to the jury as Brown was unavailable for trial. Anthony Brown was a Wheels 'N Stuff employee since its

---

[4] Bowie testified that he told Detective Chavers that Wilson had a "funny shaped mouth," but admitted on cross-examination that he did not recall whether he described Wilson's mouth when giving his first statement, or only later.

opening in 1997. The morning of January 25, 1998, Brown arrived at the car wash in the late morning. Brown planned to attend a Super Bowl '98 party with his friends and coworkers that day and planned to sell T-shirts and wash cars to make money before going to the party. As he was arriving to the car wash, Brown saw a man driving Jessie Dunn's El Camino abruptly out of the parking lot, moving forward and backward, skidding the tires, and ultimately knocking over a gate on his way off of the property. The El Camino sported IROC rims. Brown did not know the man driving the El Camino but testified that Wilson resembled the driver. Brown was ultimately unable to positively identify the driver of the El Camino as Wilson.

As he saw the El Camino driving out of the parking lot, Brown was also grabbing the T-shirts he'd planned to sell from his own car. When he did so, he saw Pops walk out of the car wash office through the front doors. Brown gestured to Pops as if to remark upon the absurdity of the driver who had just knocked over the car wash gate. Pops walked to the Honda that had been parked by the payphone, got in, pointed a TEC-9 at Brown, and fumbled with the weapon like he was trying to clear a jam. Brown tried to evade the weapon pointed at him by crawling through his own car and exiting from the passenger door. Pops then drove out of the Wheels 'N Stuff parking lot in the Honda, traveling in the same direction the El Camino had gone.

Brown went toward the car wash office and yelled into the building but did not enter. A man wearing a yellow shirt, who Brown identified as E.T., got up and ran toward him. E.T. told Brown that the men "shot everybody." The four remaining men in the car wash, all of whom had been shot and killed, included Hoard, Hurd, Potter, and Dunn. From his vantage point at the

door, Brown could see Hurd's body on the floor, and E.T. told Brown that Hurd had been shot. E.T. went on, "I don't know why they didn't kill me." E.T. looked for his car keys inside the building, but was unable to find them and asked Brown for a ride because he did "not want to be around this kind [of] mess when the police c[a]me."

While E.T. was inside the building searching for his keys, Potter's mother, Georgetta Hoard,[5] along with a friend, stopped by the car wash. Brown told Georgetta she should not go into the building, and that E.T. told him it was "a terrible sight" inside. Brown and E.T. then left in Brown's car.

Brown called his brother from the car to tell him what had happened, and Brown's brother advised Brown and E.T. to return to the car wash. They did, and both men spoke with the police already on the scene. Police officers then took Brown and E.T. to the station to be interviewed, where Brown described Pops's height, age, and hairstyle. Officers observed that motor oil and dirt stains covered E.T.'s yellow shirt.

### e.  Investigation

Compton police officer Bettye Jones was one of the first responders to the Wheels 'N Stuff scene, where she saw two women standing outside — Georgetta and her friend — and observed that one was crying hysterically. Jones looked through the front doors into the car wash, and saw a body lying on the floor. Unsure if suspects remained in the building, she placed Georgetta and her companion in a patrol car and entered the car wash with Officer Larry Urrutia. Initially, Jones and Urrutia

---

[5]   Georgetta Hoard will be referred to by first name to avoid confusion with victim Michael Hoard.

saw three men — Hurd, Potter, and Hoard, lying in the building, "obviously dead." They inspected the building further and found one additional victim — Dunn — behind a car near the back of the building. After the officers secured the building, paramedics came in, checked the pulse of the men on the floor, and determined that all of them were deceased.

Jones noted there were blood puddles and a bloody footprint on the floor and was careful to ensure that officers and paramedics did not step in the blood. A shelf had fallen inside the car wash, and the contents were strewn on the floor. Jones also observed that, in the car wash parking lot, broken headlight fragments were on the ground near the gate. The gate appeared scratched and had paint transfer damage, suggesting it had been hit by a car.

Deputy Jeff Walley, a ballistics expert, collected evidence at the scene. He recovered nine-millimeter and .40 caliber bullets, bullet fragments, casings, and one live round. Specifically, he found nine .40 caliber Smith and Wesson cartridge casings, along with 10 expended .40 caliber bullets or bullet fragments. Walley determined, based on unique gun barrel and firing pin manufacturing processes, that a Glock semiautomatic pistol fired the .40 caliber bullets found at the scene.

Walley also recovered five nine-millimeter expended casings and one live nine-millimeter round. He determined these rounds could have been fired from one of several weapons, but the only weapon with both a barrel extension and appearance different than other types of pistols, including the Glock used to fire the .40 caliber bullets, was an Intratec TEC-

9

9.[6]  A nine-millimeter casing found at the scene was dented, suggesting the weapon jammed, a malfunction in which the ammunition does not work as expected and no bullet is fired. Intratec firearms are not known to be high quality weapons and are known to jam on occasion.  No ballistics evidence other than from a nine-millimeter and .40 caliber was found at the scene; Walley concluded only two weapons were used at the scene:  a Glock that fired .40 caliber bullets, and likely an Intratec TEC-9 with a barrel extension that fired the nine-millimeter bullets.

The Office of the Medical Examiner performed autopsies on the four victims two days after the shootings.  Deputy medical examiner Christopher Rogers testified that each of the four victims were shot in their heads.  Hurd suffered one fatal gunshot wound to the back of his head, fired from a distance of at least two feet.  Potter suffered three gunshot wounds to the back of his head, all of which were fatal.  Potter was shot from a distance of at least two feet.  Hoard suffered three gunshot wounds to the back of his head, all of which were fatal.  These wounds were inflicted from a distance of at least two feet.  Hoard also suffered two nonfatal wounds to his hands from bullet fragments.  Dunn was shot five times, twice in his head, once under his arm, once in his shoulder, and once to his forearm. The shots he suffered to his head were both fatal.  The shot to the area beneath his arm was fatal, as the bullet traveled through a vein next to his heart.  The shot he suffered to his shoulder was likely fatal.  The shot to his forearm was potentially fatal.  The shots to Dunn's head were fired from a range of less than two feet.  The shots to Dunn's shoulder,

---

[6]     Bowie believed the weapon pointed at him was a TEC-9 with a long clip, and Brown saw a TEC-9 pointed at him.

forearm, and arm were each fired from a distance of at least two feet.

### f. After the shooting

On the evening of the shooting one of Pops's relatives hosted a barbeque. Larry Barnes — a friend of Pops and Wilson — attended the barbeque, along with Wilson. While there, Pops's brother, Aziz Harris, asked Barnes for assistance burning a stolen car. Barnes, Harris, and Pops's girlfriend drove in a Honda to an alley where they burned Dunn's stolen El Camino. A nine-millimeter Lorcin pistol was in the filter, in an area located beneath the car's carburetor lid. The tires were in poor condition and the El Camino had no radio.

On February 12, 1998, Detective Richard Conant of the Long Beach Police Department stopped Pops, who was driving a Camaro with chrome rims. Detective Conant conducted the stop because he believed the rims matched the description of those stolen from a car owned by one of the victims of the car wash murders. Pops's Camaro was painted a light color. Three weeks before the stop, Barnes had joined Pops, Wilson, and others at a local bowling alley, where Barnes noted that Pops's Camaro had been fitted with rims that matched the car's light paint color. The Camaro had different rims at the time of the February 12, 1998 stop.

Wilson, Harris, and Barnes were passengers in Pops's car when it was stopped. Wilson became verbally combative with detectives during the stop, angry that officers were conducting safety pat downs. Officers arrested Barnes based upon an outstanding warrant, but did not arrest Pops, Wilson, or Harris at that time.

On February 22, 1998, Bowie saw Pops at a gas station in Long Beach. Pops was driving a Camaro with IROC rims, and Bowie believed the rims were the same as those that had been on Dunn's car. As Pops left the gas station, Bowie paged Detective Reynolds, and when they spoke Bowie urgently and fearfully and described what he had seen.

### i. The lineups

On February 11, 1998, Detective Reynolds showed Williams a mug book consisting of 20 photographs spread across five pages, none of which depicted Pops or Wilson, and Williams was unable to identify anyone. Reynolds showed the same mug book to Brown, who was also unable to identify anyone. On February 12, Reynolds showed Williams a single sheet containing six images — a "six-pack" — with none of the images depicting Pops or Wilson. Williams was unable to identify anyone, but he noted that the individual depicted in the number one position "almost" looked like one of the men who participated in the shooting. Reynolds showed that same six-pack to Brown, who similarly noted that the person in the number one position looked closest to the driver.

Eight days later, Bowie participated in a photo lineup. Reynolds showed Bowie a mug book consisting of 20 photographs spread across five pages, as well as a single six-pack, none of which depicted Pops or Wilson. Bowie was unable to identify any of the individuals pictured as those involved with the murders. Reynolds next showed two photographs to Bowie, who, upon seeing them, became angry and began crying. Pointing to one of the photographs, which depicted Pops, Bowie said, "That's the motherfucker right there." Reynolds did not show any photographs of Wilson to Bowie during this lineup.

On February 23, 1998, Reynolds prepared a second six-pack, this time containing a photograph of Wilson. Bowie looked at the images and identified the person in the number two position — Wilson — as the Honda's driver. Bowie stated, "I know for sure that's him, I know the shape of his mouth." That same day, Reynolds showed Williams two different six-packs, one of which contained a photo of Pops and the other a photo of Wilson. Williams was unable to identify anyone.

On February 24, Brown participated in a photo lineup, viewing a six-pack containing an image of Wilson. Brown was unable to identify Wilson, although he told Detective Reynolds that the person in the number two position — Wilson — looked like he had the same complexion as the man he saw driving Dunn's El Camino. Brown was also unable to identify Pops from the six-pack containing his photo, and although Brown indicated that the photo of Pops was similar in appearance to one of the assailants, he said that the man he saw had a darker complexion than the individual depicted.

Several months later, on June 9, 1998, a live lineup was conducted at the Los Angeles County Jail. Reynolds testified that Bowie, Brown, and Williams attended the witness lineup, and that they did not communicate with one another during the process. All three witnesses identified Pops. Bowie and Williams identified Wilson as the driver. Brown could not positively identify Wilson although he believed Wilson was the person closest in appearance to the man he saw driving Dunn's El Camino. Brown wrote on his identification card that he "only viewed [the suspect] from behind and [got] a quick view of [his] face but [Wilson] fits best . . . ."

### ii. The searches and arrests

On March 5, 1998, Reynolds obtained warrants to search and arrest Pops and Wilson. Wilson was arrested in his home, where he was found lying on his couch with a shotgun. Officers carried out the search warrants simultaneously, and during their search of Wilson's home — where they found and arrested Harris[7] — they discovered a live round of nine-millimeter ammunition, a man's wallet, a loaded .12 gauge shotgun, a three-ring binder, and a blue pad of paper.

Officers found the bullet beneath a couch cushion in Wilson's home, where they also located Wilson's wallet.[8] The wallet held, among other contents, a business card from a gun store, which listed prices for .26 and .30 caliber Glock firearms, but not a .40 caliber Glock, the type used in the Wheels 'N Stuff shooting. Walley, the ballistics expert, identified the bullet as one ejected from the same nine-millimeter weapon that was used in the shooting. He testified the bullet could have been dropped in the home before or after the shooting.

The binder found in Wilson's home contained a single newspaper clipping about the car wash murders. Officers found no other newspapers or clippings in Wilson's home. The blue pad of paper found on Wilson's table contained pages depicting various drawings and a list of names. According to Barnes's testimony, one of the drawings was of Pops's car with the addition of IROC rims, and it was labeled "the Monster Beefy." There was also a drawing of street signs labeled "55th" and

---

[7]     Warrants for Harris's and Barnes's arrests were issued at the same time as the warrants for Pops and Wilson.

[8]     The wallet was identified as Wilson's because it contained a video rental card and calling card in Wilson's name.

"Lime," which was an intersection near Pops's and Wilson's homes. Another drawing was a caricature of Pops labeled with his moniker, "Nut," and with the word "Loco." Another drawing showed a tattooed arm firing a semiautomatic weapon; the tattoo said "Y.M.O.," which stands for "Young Mafia Organization," a group to which Wilson, Pops, Harris, and Barnes belonged. Pops was tattooed on his left and right forearms with the letters, "Y.M.O." The pad of paper also held a page listing the various monikers of the individuals who spent time with Pops and Wilson.[9]

During the search of Pops's home — where Pops was arrested — a Camaro fitted with IROC rims was seized and taken to a tow yard. The IROC rims on the car were the same as those that had been fitted on Dunn's El Camino. Anthony Boochee, who originally fit the rims on the El Camino, testified that the IROC rims had been modified to fit that car by drilling larger holes to accommodate the necessary screws and Cragar lugs. Boochee testified that the rims had been modified a second time to fit a smaller wheel, but still utilized the Cragar lugs originally placed on Dunn's El Camino. Kimberly Thomas, Dunn's girlfriend, testified she recognized the rims as having originally been placed on Dunn's El Camino because there was an oxidation spot she recognized on one of them.

### 2. *Defense Case and Rebuttal Evidence*

Although Williams initially told the prosecution he was "positive" "from a glance" and had "no doubt" regarding his

---

[9]     Pops's moniker was listed as "Nut." Wilson's moniker was listed as "Bird." Harris's moniker was listed as "Scrap." Barnes's moniker was listed as "Smerf," which he had tattooed across his stomach.

preliminary hearing identification of Pops and Wilson, he later admitted he "really did not get a good look at" one of the men. Williams explained that he has "a habit of not staring at people I don't know so, yeah, I looked over towards them and mind my own business, then I would maybe look again."

Williams had a conversation with the driver of the vehicle, who he described as having a lighter complexion than the passenger. At one point, Williams conceded during questioning that he became "confused about who was in the passenger seat and the driver's seat. It's the only thing — a small thing to be confused about; otherwise, those are the two people in the car. [¶] Now, right now, they almost look similar so for me to know which one was driving and which one was in the passenger seat is hard for me but I do know those are the two people in the car, yes." Williams also acknowledged that he lied several times while giving testimony during the preliminary hearing, although this dishonesty related to what he knew about the sale of marijuana from the car wash. Selling marijuana from Wheels 'N Stuff violated the terms of his probation.[10]

Bowie's testimony suffered from credibility concerns. Bowie had numerous prior felony convictions, including battery against the mother of his child, robbery, and burglary. Bowie denied on direct examination that he had suffered an armed robbery conviction, although he acknowledged on cross-examination that he suffered a robbery conviction as a juvenile in which a firearm was involved. Bowie maintained that Wheels 'N Stuff was a legitimate car wash business of which he was an

---

[10] Williams was on probation at the time of the shooting, having suffered felony convictions for possession of marijuana with intent to sell and possession of stolen property.

employee, and he was paid up to $300 per week, "assuming that [he] made that much," to wash cars. Williams denied paying Bowie regularly for his work, testifying he sporadically paid Bowie in small amounts if he was asked, and Bowie paid no income tax. Bowie claimed never to have seen marijuana being sold from the Wheels 'N Stuff. His claim was undermined by Williams's testimony that the building's rent was paid from marijuana sale proceeds, and by the crime scene photographs, which showed marijuana and related drug paraphernalia visible in open locations. Bowie also claimed he had never testified at a trial; this statement was impeached by a minute order from his own trial showing he testified, but he maintained he had not recalled doing so as his trial had occurred fifteen years prior to Wilson's trial.

When Bowie identified Wilson, he told Chavers he recalled what the driver looked like because of "the smirky grin on his face." Police graphic artist John Shannon testified Bowie's description of the driver was not sufficiently specific to permit him to create a sketch. He testified that Bowie did not say anything about Wilson's mouth shape or a smirk, only describing that the driver had a receding hairline, tight eyes, or "something like that." Shannon explained that when a suspect possessed some unusual feature, witnesses were usually able to describe that detail to him. Williams and Brown believed the driver wore a cap with writing on it, while Bowie described the driver's hairline. Wilson argued he did not have a receding hairline in 1998, nor did his eyes appear "tight."

Brown had testified that he saw the El Camino and the Honda leaving Wheels 'N Stuff the morning of the shooting. He began his employment with the car wash weeks after his release from county jail, where he was incarcerated after suffering

felony convictions for conspiracy and telephone fraud in 1993. Brown was unable to identify Wilson as the driver during the February 24, 1998 photographic lineup, and Wilson argues he erroneously identified another man as someone who resembled the driver.

Wilson presented evidence that he was not involved with burning the El Camino. Joseph Black, a defense expert employed by one of the manufacturers of IROC rims, testified that the rims on Dunn's El Camino appeared consistent with a 1984 rim style, and were not the same style as the rims sold with the 1988 Camaro. He testified that he did not believe IROC rims required modification to be fit on an El Camino.

With regard to the binder found in Wilson's home, no evidence suggested that Wilson made any of the drawings or that he composed the list of Y.M.O. members. No drawings of Wilson appeared in the binder.

None of the fingerprints collected from the car wash could be traced to Pops or Wilson.

Deputy Public Defender Jeanmarie Klingenbeck, a close friend of Deputy Public Defender Cheryl Jones (Pops's attorney) attended the live lineup in June 1998. She sat a few rows behind the three witnesses — Bowie, Williams, and Brown — who each sat about six feet away from one another in a row of school desks with empty desks between them. Klingenbeck noticed the witnesses motioning toward each other, "like kids would do when they were copying off papers." Klingenbeck took notes once she noticed what she perceived as "unusual activity," but she did not inform the officers at the lineup about her observations. Klingenbeck told Jones, her friend and fellow public defender, about what she saw, and she provided a

statement to Jones a few months before trial. Klingenbeck testified at trial as to her observations.

Deputy Sheriff William Gilbert of the Los Angeles County Sheriff's Department supervised the June 9, 1998 live lineup, and he testified regarding the procedures and safeguards in place. Gilbert described how witnesses are generally seated at a lineup, explaining that because there are seven seats in a row, three witnesses would be seated with two chairs between each person. Witnesses are reminded "that there is no talking, communicating or looking around in any way, shape or form, [and they are instructed] to look straight ahead." Gilbert testified that he monitored the lineup from a window in front of the stage, where he could see the lineup participants and the witnesses in the gallery. If any witness communication had been observed, the lineup would have been cancelled. The witnesses are illuminated by the light behind a two-way mirror, and the area where witnesses are seated is too dim to read a newspaper.

Attorneys attending the lineup are seated between six and eight rows behind the witnesses, and they are required to identify themselves, and to state why they're attending the lineup, before it begins. Klingenbeck intimated she was an attorney related to the case, and Gilbert testified that if she had indicated that she was merely accompanying attorney Jones she would have been asked to wait outside. The paperwork Gilbert completed in conjunction with the lineup notes no objections or incidents related to improper witness communication.

## B. Penalty Phase

### 1. *Prosecution Case*

Hurd's sister, Charmaine Hurd, testified about the toll his death took on his family, including his five children.

Wilson's prior robbery conviction was admitted via stipulation. Wilson pleaded guilty to a robbery in which he drove the getaway car while his accomplice robbed a 53-year-old woman of cash from her Aid to Families with Dependent Children ("AFDC") check by threatening to kill her companion. Wilson was 18 years old at the time of that offense and was ordered to serve 120 days in county jail.

### 2. *Defense Case*

Marcellette James, an old family friend, began writing to Wilson following his incarceration. As a child, James found Wilson to be happy, smart, and perceptive. She believed he was fairly well supported by his family, particularly his dad, during the years of his childhood during which the two were acquainted. During the first year of Wilson's incarceration, James sent him dozens of letters, cards, and Christian pamphlets. The two spoke frequently on the telephone. James and Wilson fell in love through their correspondence and continued writing letters even after Wilson's telephone privileges were revoked. James testified that Wilson's being charged with murdering four people did not change her feelings for him. James and Wilson did not speak about the murders, but James believed Wilson to be innocent and considered him a "very mature man." James testified she "matured spiritually" because of her relationship with Wilson and were he to receive the death penalty "it could be killing a part of" her.

Wilson also presented evidence of his childhood and upbringing. Byron Paul Wilson, Sr., Wilson's father, testified the family lived in Long Beach when Wilson was born, and Byron worked in housekeeping at Fairview State Hospital at that time. Byron was educated at a local community college and trade college, after which he gained employment at Univox doing technical troubleshooting work from 1983–1987. Byron used alcohol and cocaine during this period. Wilson's mother, Tonya Wilson, worked as a secretary in a school district around this time, from 1982–1990. Byron testified that during the period he was employed by Univox, Tonya also casually drank alcohol and used drugs, mainly marijuana.

Byron and Tonya's marriage was initially "okay," despite periods of infidelity. They moved to Avenal for Byron's work in 1987, and to Novato in 1989 when he became employed by San Quentin State Prison. Their drug use consistently increased as the years passed. Following another move for Byron's job when Wilson was about 11, he began socializing with Byron's and Tonya's friends, all of whom used drugs together. Tonya described their family as dysfunctional. When Tonya was under the influence of drugs "she became a changed person," sometimes physically attacking Wilson and Byron.

Tonya oversaw Wilson's education and spoke with his teachers when necessary. She testified that in elementary school Wilson was a "class clown," and he was placed in special education classes. Wilson kept to himself with friends and peers, and when he tried to have friends over to his home Wilson would become so withdrawn Tonya asked the child's parent to come and retrieve their child.

The family moved to Los Angeles, and although Wilson preferred living in small towns he eventually adjusted and grew to like it. Byron's drug abuse worsened, and he resigned from his job due to his drug use and a back injury. He and Tonya separated, and the two divorced in 1997. Tonya's mother died in 1997, and following that loss and a drug relapse, she was arrested and convicted of a felony. Byron and Tonya both lost contact with Wilson while they lived in Los Angeles.

Tonya testified about an incident in Wilson's childhood when he called 911 after she collapsed due to an ectopic pregnancy. Byron testified that Wilson — then aged seven or eight — helped care for his mother when she was ill with cancer and when she was injured in a car accident after having taken PCP.

Despite their lack of contact, Byron testified that he did not want Wilson to be executed because Wilson was his only child. Tonya testified that she loved Wilson and did not want him to receive the death penalty.

Wilson's elementary school special education teacher, Barry Carlson, testified that Wilson suffered from attention deficit disorder as a child. Wilson was capable of learning well when given individual attention and appeared happy in grade school — particularly when his teacher worked with him. He was easily distracted when left alone, and more hyperactive than other children with the same diagnosis.

Dr. Efrain Beliz, a clinical psychologist providing expert testimony for Wilson, opined that it was likely he suffered from attention deficit hyperactive disorder (ADHD) in elementary and high school. Over the course of two days, Dr. Beliz interviewed Wilson for 13 hours. Dr. Beliz explained that

ADHD sufferers are impulsive and disruptive, and that children with ADHD face an increased risk of developing substance abuse issues. Because those suffering from ADHD possess poor social skills, Dr. Beliz opined they are vulnerable to social manipulation and gang involvement.

## II. GUILT PHASE

### A. Identification of Wilson Was Proper

Wilson argues the trial court erred by denying a motion to suppress Bowie's and Brown's identifications of him.[11] He alleges the identification procedures were unduly suggestive and the resulting identifications unreliable, rendering their admissions violative of his rights under the Due Process Clause to the United States Constitution. For the reasons that follow, we conclude his claim lacks merit.

#### 1. Background

##### a. Bowie's Identification

While Bowie was using the payphone outside the Wheels 'N Stuff on January 25, 1998, he saw two men parked outside the car wash. The passenger, Pops, pointed a semiautomatic handgun at Bowie, then got out of the car and held the gun against Bowie's body. Bowie also saw the driver, whom he later identified as Wilson, get out of the car and hold a gun against Bowie's back. Pops and Wilson marched Bowie into the car wash, and the events of the shooting transpired.

---

[11] Bowie's and Brown's identifications, made in 1998, predate the enactment of section 859.7, which now mandates that law enforcement agencies adopt regulations for the administration of identification processes.

Bowie went to the police station the day after the shootings, and although he was unable to describe his assailants clearly enough for a sketch artist to produce a composite drawing, he told Chavers that the driver had a "funny shaped mouth." Bowie also said that he would be able to identify his assailants if he saw them again. Bowie participated in a photographic lineup on February 19, 1998 — less than one month after the shooting — but was shown no photos of Wilson and did not identify any of the photos he was shown as being of Wilson.[12] On February 23, 1998, Bowie returned to the police station to view a different photo lineup that did include a photo of Wilson and of five other men. Bowie identified Wilson as the Honda's driver, saying, "I know for sure that's him, I know the shape of his mouth."

At a subsequent live lineup on June 9, 1998, and at the preliminary hearing, Bowie had no difficulty identifying Wilson, highlighting the distinctive shape of Wilson's mouth. Bowie testified at the preliminary hearing that he had described Wilson's smirk to police officers when he first spoke with them the day after the shooting. Later, he was unable to recall whether he had told Chavers that Wilson had a unique mouth shape when he first gave a statement to her or only sometime later.

---

[12] Bowie was able to identify Pops. Although Bowie was shown several photo arrays — four pages with five images each, one six-pack, and two individual photographs, in that order — he did not recall the order in which officers showed the photos to him. The photo of Pops was shown to Bowie last; it was one of the two photographs shown. We need not decide whether this procedure was suggestive to address Wilson's claim of error.

### b. *Brown's Identification*

Brown arrived at the car wash right after the shooting as Wilson and Pops were fleeing the scene. He saw a person he described as a light-skinned Black man driving Dunn's El Camino out of the parking lot. Pops got into his car to leave the scene, fleeing when the gun he fired at Brown jammed.

Brown participated in a photo lineup on February 11, 1998, but none of the photos he was shown depicted Wilson, and he was not able to identify anyone. The next day he was shown a different six-pack, which also did not contain an image of Wilson, but he pointed to a picture, noting the person looked closest to the El Camino driver. On February 24, 1998, he participated in a third photo lineup — this time including a photo of Wilson — and although he did not identify Wilson, he noted Wilson had the same complexion as the man he saw driving the El Camino. At the live lineup on June 9, 1998, Brown was unable to identify Wilson with certainty, writing on his identification card that he "only viewed [the suspect] from behind and [got] a quick view of [his] face but [Wilson] fits best . . . ." Brown did not positively identify Wilson at the preliminary hearing, but testified that "[t]he light complected guy" — Wilson — "would probably best fit the description but I only seen [sic] him from the rear view and glanced at the front view."

Wilson sought to exclude evidence of Bowie's and Brown's pretrial identifications of him under Evidence Code section 402, arguing the procedures used by the police were unduly suggestive and the identifications tainted. The trial court heard the motion to exclude on March 19, 1999; Bowie appeared at the hearing, but Brown did not. The trial court ruled the procedures

employed in connection with Bowie's identification were not suggestive and it permitted the introduction of Bowie's identification. The trial court deferred ruling on the suggestiveness of Brown's identification pending his appearance at the Evidence Code section 402 hearing. Brown's appearance was never secured, and he did not testify at trial; the trial court instead declared him unavailable and counsel read his preliminary hearing testimony to the jury.

### 2. *Discussion*

Wilson claims his right to due process was violated by the introduction of Brown's and Bowie's identifications. A violation occurs " 'only if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." ' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 35.) If we determine the procedure was suggestive, no due process violation arises if " ' "the identification itself was nevertheless reliable under the totality of the circumstances." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 556 (*Clark*), quoting *People v. Kennedy* (2005) 36 Cal.4th 595, 608 (*Kennedy*).) In assessing the totality of the circumstances, we consider " 'such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' [Citations.] 'Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' [Citation.]" (*Sanchez*, at pp. 35–36.)

A defendant's claim that an identification procedure was unduly suggestive is a "mixed question of law and fact." (*Clark, supra*, 63 Cal.4th at p. 557; see also *Kennedy, supra*, 36 Cal.4th at p. 609.) This standard of review applies because "the facts are established, the law is undisputed, and the issue" we must resolve "is whether the law as applied to the established facts is violated." (*Kennedy, supra*, at p. 608.) We review the so-called "historical facts," those factual determinations that underpinned the trial court's conclusion that the identification procedure was or was not suggestive, "under a deferential standard." (*Clark, supra*, at p. 557.) This standard acknowledges that the trial court may have made "credibility determinations," that "contribute[d] to deciding the facts of what had already happened, [but] were not dispositive of the inquiry because the trial court did not have a 'first-person vantage'" to whatever "facts occurred outside of court." (*Kennedy, supra*, at p. 609.)

What Wilson argues is that Bowie's identification of his photograph was unduly suggestive because the six-pack array shown to Bowie made Wilson appear distinct from the other five individuals depicted. As a result, Wilson claims, the lineup was suggestive because his image stood out to Bowie. In particular, Wilson contends Bowie found the shape of his mouth remarkable, and he argues no other person had a similar mouth shape. Wilson argues there should have been "fillers" in the photo array; that is, he claims the array should have included photographs of other individuals who shared the characteristic mouth shape Bowie found unique. Because Bowie believed Wilson to be the only individual in the array with the uniquely shaped mouth, he argues, the procedure was impermissibly suggestive.

Wilson did not object on this basis before the trial court, but claims he has not forfeited the argument because he joined Pops's motion to exclude and the motion "cited the correct objection."[13]   Even if the argument is not forfeited (*People v.*

---

[13]   The forfeiture issue in this case is somewhat tangled. Wilson joined Pops's motion for an Evidence Code section 402 hearing.  In that motion, Pops argued that the way Bowie was shown his photograph was unduly suggestive because law enforcement officials presented several photographic arrays to Bowie, and then showed him just two pictures, one of which was of Pops.  Wilson joined Pops's motion, and the prosecution's response to Pops's motion included an argument about the propriety of Bowie's photographic identification of Wilson.  At the hearing, immediately before Wilson examined Bowie, the prosecution informed the court it assumed Wilson was joining Pops's motion.   The trial court agreed, noting that the prosecution argued Bowie's identification of Wilson was proper in its opposition.  Wilson then briefly questioned Bowie about that identification.  Pops made further argument to the court to exclude Bowie's identification, and Wilson "submitted."

Wilson claims the issue is not forfeited because the " 'court understood the issue presented.' " (*People v. Clark* (2011) 52 Cal.4th 856, 966.)  In *People v. Cunningham* (2001) 25 Cal.4th 926, 989, we held a suggestiveness claim was forfeited because defendant failed to object, but the first time suggestiveness was raised was in connection with a motion for judgment of acquittal.  In finding the suggestiveness claim forfeited in *Cunningham*, we cited Evidence Code section 353, which permits a court's reversal based on erroneously admitted evidence only if the defendant moved to exclude the evidence or objected to its admission, and the reviewing court found the evidence should have been excluded on the grounds stated in the objection, or admission constituted a miscarriage of justice.  The only ground for exclusion of Bowie's identification raised in Pops's motion was based on the suggestiveness of Bowie being shown two photos, one of which depicted Pops, after he was shown several multiple-photo arrays.  Arguably, no motion to

*Cunningham*, *supra*, 25 Cal.4th at p. 989), we conclude it lacks merit. In evaluating the suggestiveness of a photo array, we consider "whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367.) Standing out requires more than the defendant potentially being a different race than others pictured or having a photo background slightly different than other images in the array. (*Clark*, *supra*, 63 Cal.4th at pp. 556–558.) We have noted that identifying "apparent racial or ethnic identity is something that is harder to quantify and agree on." (*Id.* at p. 557.) In *Clark*, the defendant was a light-skinned Black man with a distinctively large mustache, and the other images in the six-pack showed men of a similar complexion but a potentially different race, all with similar facial hair. (*Ibid.*) We concluded in that case that nothing in the identification procedure made the witness select the defendant's photograph from among the others, even accounting for the background tone and the potentially distinct races of those pictured. (*Id.* at p. 557.) We acknowledged law enforcement faced a challenge in finding images similar to the defendant's and met it as best they could.

Like the six-pack shown to the witness in *Clark*, the images shown to Bowie all depicted men with similar complexions. (*Clark*, *supra*, 63 Cal.4th at p. 557.) Wilson's

exclude Bowie's identification based on the suggestiveness of Wilson's mouth shape was made, although the issue was addressed at the Evidence Code section 402 hearing. Whether Wilson forfeited this issue is a close question, but even if his suggestiveness claim is forfeited, nothing prohibits us from considering the merits of the issue, and we elect to do so here. (See *ibid.*; *People v. Medina* (1995) 11 Cal.4th 694, 753.)

concern is not primarily with the race of the men depicted, but with their facial expression; Wilson claims he was the only person smirking, and Bowie testified he knew Wilson by his smirky grin.  Our review of the images does not reveal anything unique about the mouth shape in Wilson's photo, nor does the shape of his mouth appear distinctive compared to the other photographs.  Even if it had, the identification was not unduly suggestive because nothing made defendant " 'stand out' " from the other men depicted.  (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 367.)  As in *Carpenter*, Wilson "was neither the oldest nor the youngest of the [six-pack] participants, neither the tallest nor the shortest, neither the heaviest nor the lightest." (*Ibid*.)

All of the men in defendant's six-pack were distinct in some respect from one another, with varying hairstyles and clothing, and each of the image backgrounds was somewhat different.  But "nothing in the lineup suggested that the witness should select defendant." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943.)  In *Gonzalez*, the defendant claimed his identification from a photo array in which he was the only person with a " 'droopy' " eye, and whose photo had a discolored background, was improper.  (*Ibid*.)  Witnesses had not previously described the defendant as having a distinctive eye, nor did we find anything particularly unique about the defendant's eye in the image.  (*Ibid*.)  We held the identification was not unduly suggestive. Likewise, here, although Bowie testified he was able to recognize Wilson by his smirk, there was nothing unique about Wilson's mouth readily visible in the image. (*Ibid*.)  To the extent Wilson's mouth shape was distinct from the other individuals depicted, we have acknowledged all humans appear somewhat different from one another. (*People v. Lucas* (2014) 60 Cal.4th 153, 237; see also *People v. Carpenter*, *supra*, 15

Cal.4th at p. 367 ["Because human beings do not look exactly alike, differences are inevitable"].) Because nothing made Wilson's image stand out, we conclude the identification was not impermissibly suggestive. (*Gonzalez*, at p. 943; *Carpenter*, at p. 367.)

Wilson also argues Brown's identification was unreliable. To evaluate this argument, "we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances." (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.) Because we did not find the identification procedure unduly suggestive, we turn next to whether the identification itself was reliable under a totality of the circumstances. We conclude that it was.

Brown did not positively identify Wilson during the photo lineup that contained his image, but said the image of Wilson most closely resembled the skin tone of the man who drove away in Dunn's El Camino. Brown acknowledged at that time he did not get a good look at the driver. Brown had selected an image at a prior photo lineup, but the person selected was not Wilson. Following his tepid identification of a person who resembled the driver, Wilson, in a photographic lineup, Brown briefly saw Wilson and Pops when he appeared for a continuance hearing in May. A month later, Brown participated in a live lineup. He did not positively identify Wilson, but indicated he most closely resembled the person Brown saw driving the El Camino, acknowledging he did not get a good look at the driver and saw him from the back. At the preliminary hearing, Brown again noted that — of the two defendants — Wilson most closely resembled the El Camino driver, although he was unable to view that person from the front.

Wilson argues that Brown's photo identification was unreliable because, after failing to select an image of Wilson during two photo lineups, his participation in a subsequent photo lineup implied to Brown that he failed to identify the proper suspect initially. We have previously concluded a witness viewing multiple photo lineups and making an identification each time was not the product of unduly suggestive procedure and conclude that is true here. (See, e.g., *People v. Johnson* (1992) 3 Cal.4th 1183, 1213–1218.) Brown viewed several photographic lineups, did not positively identify Wilson in any of them — although he twice noted images resembled the person he saw, one of which depicted Wilson — and was given no indication that he failed select the correct image. We conclude the procedure used in the photographic lineup was not unduly suggestive and unnecessary.

Wilson also contends that the passage of time between the crime and his participation in the live lineup rendered it unreliable. The Attorney General assumes for the sake of argument, as do we, that Brown's brief sighting of Wilson at the continuance hearing rendered the subsequent live lineup "suggestive to some degree." Even where an identification procedure is suggestive, we will find no due process violation if it was reliable under a totality of the circumstances, as Brown's hesitant identification of Wilson was. (*Clark, supra*, 63 Cal.4th at p. 556.) The circumstances we evaluate include how well and attentively the witness viewed the suspect, the accuracy of any prior description, how much time passed between the offense and identification, and the witness's degree of certainty — all weighed against the "corrupting effect" of the identification. (*People v. Sanchez, supra*, 7 Cal.5th at p. 36.)

Wilson argues that the passage of several months between the crime and the live lineup rendered the identification unreliable. Brown's identifications at the live lineup and preliminary hearing were uncertain; in both instances he indicated that, of the choices available, Wilson most closely resembled the man he saw because his complexion was closest. Brown acknowledged he was unable to carefully observe the El Camino's driver, and he provided no contemporaneous description of that person. Brown's failure to definitively identify Wilson at the live lineup, even after seeing Wilson in person and in a photograph, indicates the procedure was not unduly suggestive. The reliability of Brown's identification was not undermined. (See *People v. Alexander* (2010) 49 Cal.4th 873, 902 [witness's failure to make in-court identification of the defendant suggests that showing the witness photographs of the defendant the night before trial was not unduly suggestive].)

The passage of time between crime and identification, like the other circumstances, must be weighed against the damaging nature of the identification. (*Clark*, *supra*, 63 Cal.4th at p. 556; *People v. Sanchez*, *supra*, 7 Cal.5th at pp. 35–36.) Here, the "corrupting effect" of the identification was minimal. (*Sanchez*, at p. 36.) Identifying Wilson as the driver was not reliant on Brown's testimony. His identifications were consistently uncertain. If useful to any degree they bolstered the more definitive identifications provided by Bowie, and of Williams — who also positively identified Wilson as the driver during the live lineup. Moreover, Brown's identifications — at the live lineup months after the crime, but also at the photographic lineup just weeks after it — were consistently uncertain and equivocal. Considering the totality of circumstances, we

conclude Brown's uncertain identification was reliable, and no violation of Wilson's right to due process occurred.

### B. Wilson's Confrontation Right Was Not Violated by the Trial Court's Admission of Brown's Testimony

Wilson argues his Sixth Amendment confrontation right was violated by the admission of Brown's preliminary hearing testimony. Wilson acknowledges he was able to cross-examine Brown's testimonial statements at the preliminary hearing, but argues Brown was not "unavailable" to testify at his trial as that term was understood by the framers of the federal Constitution. Wilson further argues admission of Brown's preliminary hearing testimony constituted error because the prosecution failed to exercise diligence in attempting to secure his testimony at trial. We conclude that Brown was "unavailable," the prosecution exercised diligence in attempting to secure his testimony, and introduction of Brown's preliminary hearing testimony did not violate Wilson's confrontation right.

#### 1. *Background*

Brown was initially a cooperative witness. He returned to the scene of the shooting, spoke with police on several occasions, and participated in a live lineup. He was subpoenaed to, and did, testify at the preliminary hearing on June 24, 1998. Nearly a year later, in March 1999, the prosecution alerted the court to a potential problem with securing Brown's testimony at trial. Brown had received a phone call from Tracy Batts, a man incarcerated on charges unrelated to this case, who warned Brown against testifying at trial. The prosecution subsequently learned that Batts orchestrated a witness killing in his own case. The prosecution understood Brown took the threat seriously. Brown told prosecutors he would testify if he was

"dragged into court," but the prosecution believed it would be able to secure his testimony with sufficient time to work with him.

The prosecution requested that Brown attend a hearing in March 1999 but did not believe his attendance could be secured so quickly. That proved prescient, and despite the prosecution's efforts to secure his appearance, Brown did not attend the hearing. The prosecution then subpoenaed Brown to appear for a hearing in May 1999. Brown signed the subpoena but did not appear, although he indicated he would meet with Detective Frederick Reynolds — a law enforcement contact with whom he had been in touch throughout the investigation — shortly thereafter. Brown did not attend that meeting.

Trial began on May 26, 1999, and on June 7, 1999, the prosecution sought — and the court ordered — a body attachment for Brown with bail set at $50,000. The prosecution noted that if it could not secure Brown's presence at trial it would seek to introduce his preliminary hearing testimony. The prosecution made efforts — detailed below — to secure Brown's testimony, and although Brown agreed to come to court he again failed to appear.

On June 17, 1999, the court held a hearing to address whether the prosecution had exercised due diligence in seeking Brown's appearance at trial. Detective Reynolds testified about his efforts to secure Brown's testimony, which included serving Brown with a subpoena at his workplace, Melvin Hoard's autobody shop, on May 20, 1999. Detective Reynolds returned to Melvin's autobody shop the next day, and Brown was not there. Melvin did not know where he was. Over the next few weeks, Detective Reynolds attempted to contact Brown at his

last known address multiple times. He also sought to contact Brown at the home of his ex-girlfriend, Nicole Washington. Detective Reynolds spoke with Washington in June 1999, and she claimed Brown had not been to her home for months, that Brown would not tell Washington his address, noting he was afraid to appear in court.

During this period of time, Brown and Detective Reynolds spoke frequently by telephone, and despite Brown making plans to meet Detective Reynolds on several occasions, he consistently failed to keep their appointments. Detective Reynolds searched for arrest records for Brown and confirmed he had not been arrested. Neither Detective Reynolds nor the prosecution team checked local hospital records, voter registration, or the post office. While Detective Reynolds investigated Brown's last known address, employer, and frequent hangouts, he and the prosecution team did not try to find Brown via public assistance rosters.

Defense counsel urged the trial court to conclude the prosecution had not exercised due diligence in seeking Brown's appearance at trial. The trial court ruled otherwise, concluding that Brown made "active efforts to avoid" Detective Reynolds. The court ruled that had the prosecution team been able to make contact with Brown on or after May 20, 1999, efforts to secure a bond or to arrest Brown would have occurred at that time. The trial court declared Brown unavailable and permitted his preliminary hearing testimony to be read to the jury.

Brown was not the only reluctant witness in this case. The prosecution believed that Barnes, a juvenile probationer, would be hesitant to testify and sought a bond to secure his appearance, arguing to the court it was likely Barnes would

make himself scarce during the pendency of the trial. The court ordered the bond, Barnes failed to post it, and he was remanded to custody. Barnes did not testify at the preliminary hearing. The prosecution also sought to secure the appearance of a third reluctant witness who was subpoenaed and failed to appear at the preliminary hearing. As with Brown, the prosecution engaged in a multitude of efforts to secure the witness's appearance, speaking to the witness's family, associates, and generally saturating the area over a "considerable" period of time. The prosecutor ultimately released the witness without bond, having decided not to use the witness's testimony at trial.

### 2. *Discussion*

The Confrontation Clauses of the state and federal Constitutions guarantee defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. 1, § 15.) "The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness.' " ' " (*People v. Herrera* (2010) 49 Cal.4th 613, 620–621.) Via the confrontation right, a defendant is able to compel prosecution witnesses to appear before the jury so their credibility may be assessed. (*Id.* at p. 621.)

Although the constitutional right of confrontation is important, it is not absolute. (*People v. Herrera, supra,* 49 Cal.4th at p. 621.) If a witness is unavailable but had previously testified against the defendant and was subject to cross-examination at that time, that prior testimony may be admitted. (*Ibid.*, citing *Barber v. Page* (1968) 390 U.S. 719, 722; *People v. Cromer* (2001) 24 Cal.4th 889, 897.) Evidence Code section 1291 codifies this exception to the Confrontation Clauses, stating,

"Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subds. (a), (a)(2).) We have held this exception permits an unavailable witness's preliminary hearing testimony to be admitted at trial. (*Herrera, supra*, at p. 621; *People v. Seijas* (2005) 36 Cal.4th 291, 303.)

Wilson argues the trial court erred by admitting Brown's preliminary hearing testimony because he was not unavailable to testify at trial as that term was understood when the federal Confrontation Clause was drafted, and even under a modern interpretation of unavailability the prosecution did not exercise diligence in attempting to secure Brown's presence at trial. Wilson argues that because Brown was not "dead, in extremis, [] detained by the defendant," or outside the trial court's jurisdiction, Brown's preliminary hearing testimony should not have been introduced. Wilson urges us to adopt the originalist interpretation of "unavailability" because the high court's decision in *Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*) commands conformity with the common law at the time of this nation's founding.

In *Crawford*, the court underscored that "reliability of evidence" is a goal embodied in the Confrontation Clause. (*Crawford, supra*, 541 U.S. at p. 61.) One way reliability is tested is "in the crucible of cross-examination." (*Ibid*.) In acknowledging that "[r]eliability is an amorphous, if not entirely subjective, concept" (*id*. at p. 63), the court held that "[w]here

testimonial evidence is at issue" — as it is here — "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination" (*id.* at p. 68). *Crawford* did not define unavailability, but in a pre-*Crawford* decision, the court explained the "basic litmus of Sixth Amendment unavailability" as follows: " '[A] witness is not "unavailable" for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' " (*Ohio v. Roberts* (1980) 448 U.S. 56, 74.)[14]  California law is in accord.  Evidence Code section 240 includes in its definition of unavailability a witness who is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).)

We recently explained that prior testimony of an unavailable witness may be admitted if, at that prior hearing, "the defendant had the opportunity to cross-examine the witness . . . ." (*People v. Sánchez* (2016) 63 Cal.4th 411, 440 (*Sánchez*).)  The prosecution must demonstrate that "the witness is unavailable and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*Ibid.*)

---

[14]  This aspect of the analysis in *Ohio v. Roberts* survived *Crawford*. (See, e.g., *People v. Herrera*, *supra*, 49 Cal.4th at p. 622 [implicitly acknowledging, in a post-*Crawford* decision, that although *Ohio v. Roberts* was disapproved on other grounds by *Crawford*, its analysis concerning "[t]he ultimate question [of] whether [a] witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness" remained viable].)

While due diligence lacks a precise definition, we have explained that it " ' "connotes persevering application, untiring efforts in good earnest, [and] efforts of a substantial character." ' " (*Ibid*.) We evaluate whether the prosecution timely searched for the unavailable witness, whether the prosecution "competently explored" leads on the witness's location, and the overall import of the unavailable witness's testimony. (*Ibid*.) We review de novo the trial court's unavailability determination, although we defer to the trial court's determination of historical facts supported by substantial evidence. (*Ibid*.)

Wilson argues the trial court erred by finding Brown unavailable because the prosecution did not exercise good faith or reasonable diligence in attempting to secure his trial testimony. We're not persuaded. The prosecution initially had no reason to suspect Brown would be a reluctant or unavailable witness — he willingly participated in identification and preliminary hearing proceedings in June 1998. It was not until March 1999 that the prosecution understood Brown was apprehensive, and not until May 1999 that serious concerns began to arise about his participation in proceedings. On May 20, 1999, Brown was subpoenaed to appear at trial, but failed to do so. Detective Reynolds tried to contact Brown at Melvin Hoard's body shop, where Brown worked, but failed in his efforts. Brown and Detective Reynolds spoke several times by telephone in May and June 1999, and although Brown promised he would meet with Detective Reynolds those meetings did not occur. During these calls, Brown consistently refused to reveal his address or permanent phone number. Detective Reynolds visited Brown's last known address three times, but a neighbor told Detective Reynolds that Brown had not been seen there for about two months, and Brown's ex-girlfriend confirmed he had

moved away to an unknown location after the shootings due to fear of testifying.  Brown's ex-girlfriend had received collect calls from people looking for Brown.

Detective Reynolds visited Melvin Hoard's shop a few more times in June 1999 — once after Brown told him the two could meet there — but Brown was never there.  Detective Reynolds visited another location where Brown was said to frequent, but he did not see Brown there.  In mid-June 1999, after Brown failed to make it to a scheduled meeting with Detective Reynolds at the police station, Detective Reynolds confirmed Brown was not in custody.  These many efforts undertaken by Detective Reynolds on behalf of the prosecution are the very definition of " ' "persevering application, untiring efforts in good earnest, [and] efforts of a substantial character." ' "  (*Sánchez, supra,* 63 Cal.4th at p. 440.)

Wilson contends the prosecution could, and should, have done more to find Brown, and suggests several avenues of inquiry about his whereabouts that were not pursued.  He argues, for example, that the prosecution could have checked with Brown's relatives, assigned multiple investigators to the task of locating Brown, or sought records from the Department of Motor Vehicles.  Notwithstanding these possibilities, the prosecution can be said to have "competently explored" numerous leads, in a manner consistent with its responsibility under the Confrontation Clause.  (*Sánchez, supra,* 63 Cal.4th at p. 440.)  Wilson argues that the prosecution should have done more to secure Brown's testimony.  He cites the prosecution's efforts in *People v. Bunyard* (2009) 45 Cal.4th 836 (*Bunyard*) as an example of what should have been done here, including: repeatedly seeking the witness out at his last known address, asking for information on his whereabouts from acquaintances

and relatives, and returning to locations the witness was known to frequent. (*Id.* at p. 855.) We held those efforts demonstrated diligence, and conclude here that the prosecution engaged in equivalently diligent efforts. (*Ibid.*)

What the prosecution did here contrasts with cases where courts have found deficiencies — cases where review did not reveal "adequate diligence, [and where] the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent." (*Bunyard*, *supra*, 45 Cal.4th at p. 855.) In contrast, "diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period." (*Id.* at p. 856.) Detective Reynolds's efforts to secure Brown's testimony once it became clear he would no longer cooperate spanned a month and included pursuit of multiple avenues of inquiry. The efforts were far from perfunctory or negligent. Simply because Wilson suggests Detective Reynolds could have taken different steps does not mean those he did take lacked diligence.

Wilson correctly notes we consider the import of Brown's testimony in evaluating the reasonableness of the prosecution's efforts. (*Sánchez*, *supra*, 63 Cal.4th at p. 440.) While Brown's testimony was helpful to the prosecution's case, it was not critical. Brown witnessed his coworker Dunn's El Camino being hastily driven out of the Wheels 'N Stuff parking lot the morning of the shooting, but he was not able to positively identify Wilson as the driver of that car. Brown noted that Wilson looked like the driver but acknowledged his uncertainty. In contrast, Bowie unequivocally identified Wilson as one of the two assailants.

Wilson argues we must also consider the fact that this is a capital case in our evaluation of the prosecution's diligence. We

have not previously held the nature of the charged offense is a factor in assessing diligence, but nevertheless conclude the prosecution's efforts to secure Brown's testimony were diligent despite the nature of the charged offenses. (See *Cook v. McCune* (10th Cir. 2003) 323 F.3d 825, 835 ["[T]he more serious the crime for which the defendant is being tried, the greater the effort the government should put forth to produce the witness at trial"]; *McCandless v. Vaughn* (10th Cir. 1999) 172 F.3d 255, 266 [same].)

Federal authority also suggests that "a good measure of reasonableness is to require the State to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available." (*Cook v. McCune*, *supra*, 323 F.3d at p. 836.) In *McCandless v. Vaughn*, *supra*, 172 F.3d at page 269, the court concluded a Confrontation Clause violation arose when unduly minimal efforts were used to secure the presence of a witness at trial who had provided prior testimony when compared against what efforts would have been undertaken to secure attendance by a witness who had not. Here, the efforts to secure Brown's testimony are not directly comparable to the efforts undertaken with the two other reluctant witnesses. But they were sufficient. The prosecution believed Barnes would be reluctant at the outset of proceedings and promptly sought a bond; Barnes was placed in custody after failing to post the bond, and he did not testify at the preliminary hearing. A third witness failed to appear at the preliminary hearing after being subpoenaed, and the prosecution visited the area where the witness was known to spend time, talking to the witness's friends and family members on multiple occasions. Ultimately, the prosecution elected to proceed without that witness's testimony. Compared against this third witness, the

prosecution expended greater efforts to locate Brown — talking to friends and family, visiting his last known addresses and workplace on multiple occasions, and searching arrest records — and Brown had provided prior testimony. It is harder to compare the prosecution's efforts to secure Brown's testimony against the effort undertaken with Barnes, because the latter was reluctant from the outset and a bond was immediately issued. This difference reflects Brown's initial willingness to work with the prosecution, not that he provided prior testimony. In any event, we conclude the prosecution was reasonably diligent in its efforts to secure Brown's testimony.

## C. Second Degree Murder Instructional Error Allegation

Wilson contends the trial court erred by failing to instruct the jury, sua sponte, on the lesser included offense of unpremeditated second degree murder. Because there was insufficient evidence to support that instruction, we conclude no error occurred.

### 1. Background

On the morning of the shooting, Wilson and Pops waited in a car outside Wheels 'N Stuff. Williams approached the car and asked them what they needed. They told Williams they were looking for some "sounds," but after being told they should go look elsewhere they remained in the car for some time. Bowie arrived at the car wash, and as he stopped to talk on a payphone before going inside Wilson and Pops forced him into the car wash at gunpoint, and ordered everyone inside to lay on the ground. Wilson was heard asking for money and "shit," presumably meaning drugs, and both he and Pops rummaged through the car wash before shooting and killing four of the men inside.

Wilson fled the scene in Dunn's El Camino and Pops left in the Honda in which the two men had arrived. When police arrived at the car wash they found the victims' pockets had been searched, and saw that empty boxes were scattered across the floor. Williams testified that from the pictures taken at the scene, there appeared to be far less marijuana in the shop following the shooting than there had been that morning.

The information charged Wilson with four counts of murder "with malice aforethought" in violation of section 187, subdivision (a). He was also charged with, and the jury found true, multiple-murder, burglary-murder, and robbery-murder special circumstances. Despite the charging language, the prosecutor only pursued a felony-murder theory at trial, and the jury was only instructed on that theory.

### 2. Discussion

Wilson claims the trial court erred by failing to instruct the jury on nonpremeditated second degree murder. We review such claims of error de novo. (*People v. Souza* (2012) 54 Cal.4th 90, 113; *People v. Licas* (2007) 41 Cal.4th 362, 366.) " ' " '[I]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 115.)

To determine if a lesser offense is included in a greater offense, we consider whether the pleading charging the

defendant described the offense in such a manner that the offender, if guilty, must necessarily have also committed the lesser crime. (*People v. Smith* (2013) 57 Cal.4th 232, 240.) There must be, at a minimum, substantial evidence demonstrating the lesser offense was committed. (*People v. Westerfield* (2019) 6 Cal.5th 632, 718 (*Westerfield*).) In general, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which finds substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Substantial support requires introduction of " ' " ' "evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " ' [Citation.]" (*Westerfield*, at p. 718, quoting *People v. Valdez, supra*, 32 Cal.4th at p. 116.)

Here, although Wilson was charged with four counts of murder "with malice aforethought," the prosecutor exclusively pursued a felony-murder theory, and the jury was only instructed on that theory. "[W]e have previously declined to address the question of whether second degree murder is a lesser included offense of first degree felony murder." (*Westerfield, supra*, 6 Cal.5th at p. 717.) Wilson argues that, because he was charged with first degree premeditated murder, second degree nonpremeditated murder — i.e., " ' "the unlawful killing of a human being with malice, but without the additional elements . . . that would support a conviction of first degree murder" ' " — is necessarily a lesser included offense. (*People v. Banks* (2014) 59 Cal.4th 1113, 1160 (*Banks*).) In *Banks,* the defendant was charged with "willfully killing [the victim] with malice aforethought." What we concluded is that "second degree murder was plainly a lesser included offense of felony murder *as charged* . . . ." (*Ibid.*)

As in *Banks*, second degree murder was "plainly" a lesser included offense of the murder "*as charged.*" (*Banks*, *supra*, 59 Cal.4th at p. 1160.)  Nevertheless, we conclude the trial court's decision to forgo a nonpremeditated second-degree murder instruction was proper.  " ' "[T]here is no evidence that the offense was less than that charged.  [Citations.]" ' " (*People v. Valdez, supra,* 32 Cal.4th 73, 115.)  Wilson posits a version of events in which he and Pops went to the car wash to buy marijuana and an unexpected confrontation inside the building occurred, culminating in the shooting and deaths of four individuals.  That version is unsupported.

What the evidence demonstrated is that each of the murders occurred during a burglary or robbery; indeed Wilson was convicted of both offenses.  There was scant evidence from which a reasonable jury could have concluded Wilson committed second degree murder, but not first degree murder.  Wilson and Pops were armed.  They waited in their car for between 15 and 20 minutes, with Williams first spotting them when he arrived at the car wash, spending 15 minutes inside, then approaching them to ask what they needed.  After Williams spoke with Pops and Wilson, he put water in his radiator and left the car wash; they were still in their car at this point, suggesting they were outside of the car wash for at least 15 to 20 minutes.  During their conversation with Williams, they declined his overture to sell them marijuana.  They then led Bowie into the car wash at gunpoint demanding to know "where . . . the money and where . . . the shit" were kept.  Finally, once inside, Wilson and Pops forced those in the car wash to lie on the ground while Wilson and Pops searched through the building before shooting the four victims.  In light of these facts, including the methodical, execution-style killings of the four victims, Wilson's theory does

not "support a second degree murder instruction, but merely points to evidence that there may have been a struggle," a fact not in dispute here. (*People v. Valdez*, *supra*, 32 Cal.4th at p. 116.) Indeed, Bowie testified there was "a lot of ruckus," "struggling or something," and "a bunch of commotion." Williams testified that there appeared to be far less marijuana in the shop following the shootings than what was present when he had been there earlier that morning. Boxes were found strewn about the car wash following the shooting, and Pops and Wilson had searched the victims' pockets. Wilson's theory that the struggle resulted from a drug purchase gone wrong is purely speculative, which we have held " 'is an insufficient basis upon which to require the giving of an instruction on a lesser offense.' " (*Westerfield*, *supra*, 6 Cal.5th at p. 718.)

Both first and second degree murder require proof of an unlawful killing committed with malice aforethought, but only the former requires evidence of willfulness, premeditation, and deliberation.[15] (*People v. Chiu* (2014) 59 Cal.4th 155, 325.) Wilson and Pops brought weapons to the car wash, watched and waited, and eventually entered, stole marijuana and cash, and shot four people. Such evidence demonstrates deliberation and premeditation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081–1082.) On these facts, no reasonable jury could have concluded that Wilson acted without willfulness, premeditation, and deliberation. To the extent some evidence may exist to dispel a finding of premeditation and deliberation — and there is none

---

[15] " ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 58.)

here — we note the " 'substantial evidence requirement is not satisfied by " 'any evidence . . . no matter how weak,' " but rather by evidence from which a reasonable jury could conclude "that the lesser offense, *but not the greater*, was committed." ' " (*Banks*, *supra*, 59 Cal.4th at pp. 1160–1161, italics added.) On this evidence the jury could only conclude that first degree murder was committed, whether under a premeditation or felony murder theory. Because no reasonable jury would have been able to conclude that Wilson committed only the lesser offense of nonpremeditated second degree murder, the trial court did not err by failing to instruct the jury on that offense. (*Westerfield*, *supra*, 6 Cal.5th at p. 717.)

Wilson claims the trial court's failure to provide a second degree murder instruction runs afoul of the United States Supreme Court's decision in *Beck v. Alabama* (1980) 447 U.S. 625, 638 (*Beck*). A trial court satisfies *Beck* when the jury is provided a noncapital third option beyond the " 'all-or-nothing choice between capital murder and innocence.' " (*Schad v. Arizona* (1991) 501 U.S. 624, 647.) Where substantial evidence does not support an instruction on the lesser offense, *Beck* is not implicated. (*People v. Smith* (2018) 4 Cal.5th 1134, 1167.) We have previously concluded no error under *Beck* flows from a trial court's failure to provide a sua sponte second degree murder instruction where substantial evidence would not support such an instruction and we affirm that holding here. (*Westerfield*, *supra*, 6 Cal.5th at pp. 717–718.)

## D. Theft as Lesser Included Offense of Dunn Robbery

Wilson argues the trial court erred by failing to instruct the jury, sua sponte, on the lesser included offense of theft.

Although the issue is close, we conclude no instruction on theft was warranted.

Wilson was found guilty of robbing Dunn of his El Camino car. He claims the intent to steal could have been formed after force was used in this case, warranting an instruction on the lesser included theft offense. (See *People v. Powell* (2018) 6 Cal.5th 136, 165; *People v. Breverman, supra*, 19 Cal.4th at p. 162.) As Wilson notes, theft is a lesser included offense of robbery if the intent to steal is formed "after force was used." (*People v. Turner* (1990) 50 Cal.3d 668, 688.) The Attorney General may be understood to argue that no instruction is warranted if the intent to steal preceded the use of force. But this is not the correct standard. The obligation to instruct on a lesser included offense arises whenever the evidence " ' "raises a question as to whether all the elements of the [greater] offense were present." ' " (*People v. Valdez, supra*, 32 Cal.4th at p. 115.) "This substantial evidence requirement is not satisfied by ' "*any evidence* . . . no matter how weak," ' but rather by evidence from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.' " (*People v. Avila* (2009) 46 Cal.4th 680, 705, emphasis added.) Here, the obligation to instruct on theft would have arisen if a reasonable jury could have concluded that Wilson committed theft, but not robbery when he took the El Camino, i.e., if there were evidence from which a reasonable jury could conclude that Wilson formed the intent to steal the El Camino after force was used.

Wilson claims Brown saw someone driving the El Camino only after the car wash assault had concluded. From this evidence, he argues it is reasonable to surmise the intent to steal the El Camino was formulated only after the assault, as he

wished to use the car as a getaway vehicle. He argues this inference is particularly reasonable in light of the large number of shots fired and the presence of witnesses. Wilson argues he could have anticipated a significant police response, and Bowie's testimony that he heard sirens and saw police at the car wash quickly following the shooting confirms that Wilson's concern was well founded. Wilson further argues that the decision to burn the car immediately following its use also suggests no intent could have been formed prior to the violent act because there was no intent to sell it or its component parts.

Wilson's claim lacks merit. Here, little if any evidence suggests Wilson "formed the intent to steal only after shooting" the victims. (*People v. Powell, supra*, 6 Cal.5th at p. 165; see also *People v. Valdez, supra*, 32 Cal.4th at p. 115 [" ' "giving instructions on lesser included offenses [is warranted] when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" ' "].) Overwhelming evidence supports the conclusion that Wilson and his accomplice formed the intent to steal the El Camino prior to entering the car wash. Wilson waited in his car, armed, for some time before entering the building. The El Camino pulled into the Wheels 'N Stuff parking lot, at which point Wilson and Pops forced Bowie into the building at gunpoint. Once inside, they ensured Bowie's silence until Dunn had entered the building, then demanded the building's occupants — including Dunn — lay on the ground. At this point they asked where the money and "shit" were kept, shot the victims, took money and marijuana, and — although it is not clear whether or how the keys to the El Camino were obtained — Wilson then stole the El Camino. After the robbery,

Pops retained the El Camino's rims, and installed them on his Camaro.

Wilson argues there was no evidence that Pops knew about the El Camino or its rims prior to the incident at the car wash, and merely stole the car as a convenient getaway vehicle. While it's conceivable that Wilson and Pops decided to flee the scene in different cars and the El Camino's theft was merely opportunistic, at least two points undermine this theory.

First, even if Wilson and Pops did not know about the El Camino and its specialized rims before they drove to Wheels 'N Stuff, a jury could easily conclude the intent to steal the car — once they were aware of it — was formed prior to the murders. A jury could so infer from how Pops used the rims after the shooting. The El Camino's rims would not have fit most tires, having been manufactured for use with a Camaro, and requiring special modification to be placed on an El Camino, as Dunn had done. The evidence suggested Pops was interested in obtaining the rims, as he immediately added them to his car, the only other make of car on which the rims would have fit. Moreover, Pops's Camaro already had custom rims that matched the car's exterior paint color, suggesting he valued the IROC rims above those already on his car. A drawing of Pops's Camaro sporting the prized IROC rims was found in Wilson's home after the crime. This evidence suggests the car was taken not simply as a convenient getaway, but because Pops and Wilson valued it.

Second, Wilson's theory that the El Camino was stolen only after the shootings for use as a getaway car also seems unlikely because Pops and Wilson arrived at the car wash in their own car, obviating the need for a getaway vehicle. Further, we note the El Camino was not the only vehicle at the car wash;

Pops and Wilson rummaged through a car parked inside the car wash building but did not take that car — for reasons the record does not reflect. E.T., one of the men inside the car wash who was not shot, was unable to find his car keys after the violence concluded and left the scene with Brown. Even if he possessed keys or access to multiple vehicles parked at the car wash, Pops did not take leave the scene using one of those cars. Instead, he drove away in the same vehicle he brought to the car wash. Surely Wilson could have done likewise. Accordingly, we conclude the trial court properly did not provide an instruction on the lesser included offense of theft. (*People v. Friend* (2009) 47 Cal.4th 1, 52 ["There was no substantial evidence that defendant formed an intent to steal only after he . . . fatally [injured] the victim, and thus no factual predicate for instructing the jury on theft as a lesser included offense"].)

### E. Guilt Phase Instructional Error Claims

Wilson contends the related jury instructions, CALJIC Nos. 2.01 and 8.83, undermined the requirement of proof beyond reasonable doubt because they "informed the jurors that if Wilson reasonably appeared to be guilty, they could find him guilty — even if they entertained a reasonable doubt as to guilt." We have previously rejected similar challenges to these instructions, and Wilson presents no persuasive reason to do otherwise here. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1019.)

Wilson also posits that four other instructions the jury received, CALJIC Nos. 2.21.2, 2.22, 2.27, and 2.51, "magnified the harm" caused by instructing the jury with CALJIC Nos. 2.01 and 8.83 because "the instructions implicitly replaced the 'reasonable doubt' standard with the 'preponderance of evidence'

test, and violated the constitutional prohibition against convicting a capital defendant on any lesser standard of proof." As Wilson acknowledges, we have previously rejected this argument, and he advances no persuasive reason to reconsider our prior rejection of substantially similar challenges to these instructions. Accordingly, we again conclude that CALJIC Nos. 2.21.2, 2.22, 2.27, and 2.51 do not undermine or dilute the reasonable doubt standard. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 653–654.)

### F. Sufficiency of Evidence of Hurd Robbery

Wilson contends the trial court erred by failing to enter judgment of acquittal of the Hurd robbery because insufficient evidence supported his conviction for that offense. Following our independent review of the evidence, we agree with the trial court's ruling.

#### 1. *Background*

Williams and Hurd, lifelong friends, co-owned the Wheels 'N Stuff car wash. They had both suffered prior convictions of marijuana possession for sale. While washing cars was part of the business conducted at Wheels 'N Stuff, a major part of the business activities included selling marijuana. The building's rent was paid from marijuana sale proceeds. Williams testified that marijuana was present at the business on a daily basis. The individuals who frequented the shop, both customers and employees, tended to carry large amounts of money — upwards of $10,000. When Wilson entered the Wheels 'N Stuff on the day of the shooting, he demanded to know the location of money and "shit," by which he presumably meant drugs.

Following presentation of the foregoing evidence during the prosecution's case-in-chief, Wilson unsuccessfully moved for

acquittal of the Hurd robbery charge under section 1118.1, arguing the prosecution failed to present sufficient evidence to support a conviction.

### 2. *Discussion*

When a trial court rules on a motion for a judgment of acquittal under section 1118.1, the standard the trial court must apply is the same as what the appellate court applies when reviewing the sufficiency of the evidence supporting conviction. A section 1118.1 motion is used to cull the " ' "few instances in which the prosecution fails to make even a prima facie case." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 249.) A court resolves a section 1118.1 motion by determining whether the prosecution presented sufficient evidence, measured from the moment the section 1118.1 motion is made, to permit the jury to resolve the issue. (*Ibid.*) We review the trial court's determination de novo. (*Ibid.*)

Here is how robbery — the charged offense — is defined: "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Robbery requires the "specific intent to permanently deprive" the victim of his or her property. (*People v. Young* (2005) 34 Cal.4th 1149, 1176.)

Wilson contends insufficient evidence supported the Hurd robbery charge because, while true that Hurd was a co-owner of the car wash business, there was no evidence that he was involved in the marijuana business. Wilson argues, in essence, that the marijuana enterprise was Williams's business alone. This interpretation is not supported by the evidence. Williams testified that he and Hurd were lifelong friends who owned the

Wheels 'N Stuff together and paid rent on the building from proceeds of marijuana sales. Both had been arrested for possession of marijuana for sale. It was well known that car wash employees — including Hurd — sold marijuana and tended to carry large amounts of cash. Wilson likely knew this, as he and Pops sought the location of money and "shit" immediately upon entering.

Wilson argues that this evidence was insufficient to support a robbery charge because Hurd was not part of the marijuana business, no money or drugs were stolen from him directly, and he suffered no deprivation sufficient to constitute robbery. He also claims his motion for acquittal should have been granted because Hurd lacked constructive possession of the property — that is, the money and drugs — alleged to have been taken from Wheels 'N Stuff. We are unpersuaded.

The element of possession under the robbery statute can be established in multiple ways. Possession or direct physical control over an object will suffice but neither is essential. (*People v. Scott* (2009) 45 Cal.4th 743, 749–750.) Constructive possession by an employee is also sufficient to establish the element. (*Ibid*.) In *Scott,* we explained that because anyone committing robbery in a business establishment would perceive an employee as capable of resisting, "all on-duty employees have constructive possession of their employer's property during a robbery." (*Id*. at p. 755.) A wrongdoer's decision to threaten or use force against an employee "is not likely to turn on fine distinctions regarding a particular employee's actual or implied authority." (*Ibid*.)

Whether the evidence supported Hurd's constructive or actual possession, it was sufficient for a jury to have concluded

Wilson intended to permanently deprive Hurd of money, marijuana, or both. (§ 211; *People v. Dalton, supra,* 7 Cal.5th at p. 249.) The trial court concluded as much, stating the jury "could find a robbery of the people connected to the business based on the narcotics." Our independent review leads us to the same conclusion. (*Dalton,* at p. 249.) That a different trier of fact could have concluded otherwise does not mean the verdict is not supported by the evidence. (*People v. Farnam* (2002) 28 Cal.4th 107, 143.) We are not free to reform the verdict simply because another theory is plausible. (*People v. Jackson* (2016) 1 Cal.5th 269, 345 [" 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding' "].)

A reasonable jury could have inferred from the evidence presented — and this jury did — that Wilson intended to permanently deprive Hurd of his money, belongings, and marijuana. Because it appears the evidence was sufficient to substantiate a robbery conviction, we conclude the trial court committed no error in denying Wilson's motion for acquittal under section 1118.1.

## G. Prejudicial Hearsay Admission Allegation

Wilson argues the trial court erred in admitting the pages of the writing tablet containing drawings and a list of names. He claims the documents were improperly authenticated and constituted hearsay, and their admission violated his confrontation rights. For the reasons that follow, we conclude Wilson's claims lack merit.

## 1. *Background*

Following execution of a search warrant at Wilson's home, officers seized — among other items — a writing tablet containing several drawings and a list of names. The prosecution sought to introduce some of the documents, including: (1) a depiction of a firearm being fired; (2) a drawing of a man holding a firearm with the words "Nut LOCO" at the top of the page; (3) a caricature-style drawing of a muscled male standing at a street corner with street signs reading "55th" and "Lime," the corner near Wilson's home, the moniker "Nut" at the top of the page, and a drawing of a car with what appeared to be IROC rims labeled "THE MONSTER BEEFY"; (4) a drawing of a figure's chest, right forearm tattooed with the letters "Y.M.O.," and hand holding a firearm being fired; and (5) a list of 22 nicknames, including Pops, Wilson, and people who spent time with them.

At a pretrial hearing held under Evidence Code section 402, the prosecutor presented evidence that the home from which the tablet was seized was Wilson's residence. He argued that the drawings and list were admissible as circumstantial evidence demonstrating that the drawings were prepared close in time to the shootings, that they were found on Wilson's kitchen table in plain view, and that they demonstrated a relationship between Pops and Wilson. Wilson argued the drawings and list constituted inadmissible hearsay, that they were incapable of authentication because they were found in a common area of his residence, and that there was no evidence he personally created the documents. The trial court tentatively ruled the evidence was admissible as "relevant circumstantial evidence on motive — the connection between the defendants and circumstantial evidence of the possession of the guns by the

defendants . . . ." The court affirmed its tentative ruling on June 7, 1999, clarifying the drawings and list would be admitted for the limited purposes of connecting Pops to Wilson's residence where the items were seized, and to confirm the association between Pops and Wilson.

### 2. *Discussion*

Wilson argues the trial court erred by admitting the drawings and list of names because they constituted improperly authenticated writings under Evidence Code sections 250 and 1401, and because they constituted inadmissible hearsay with no applicable exception justifying their admission. We conclude Wilson's arguments lack merit.

Evidence Code section 250 defines a " 'writing' " to include "every . . . means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, . . . or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." "Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).) "Authentication . . . means . . . the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is . . . ." (Evid. Code, § 1400.)

Wilson argues that the list and drawings were writings within the meaning of Evidence Code section 250 but were inadmissible because they were not properly authenticated. He argues there was no direct evidence the documents were authored by him, and neither the location in which they were found nor their accessibility was sufficient to prove ownership. We review a trial court's determination that a document constitutes a writing and that it is properly authenticated under

the abuse of discretion standard. (*People v. Lucas* (1995) 12 Cal.4th 415, 466; see *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 ["The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence"].) Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Guerra, supra*, at p. 1113, citing *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

A writing can be authenticated by circumstantial evidence and by its contents. (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187.) Wilson argues proof of authentication was flawed because no evidence demonstrated that he brought the tablet into the residence or that it belonged to him, and nothing suggested that he authored the writings.

As Wilson concedes, however, authentication of a writing can occur via numerous methods, including presentation of circumstantial evidence, and by introducing evidence showing where documents were found or by whom they were authored. Here, the trial court concluded that the list of names and drawings were properly authenticated by location, content, and circumstantial evidence. The writing tablet was found in Wilson's residence. The prosecution had two witnesses testify as to the contents of the drawings and the list. Tanesha Martin testified that she believed Pops was the man depicted in the drawing entitled "Nut LOCO" who was holding a gun. Martin testified that the drawing entitled "Nut and the Monster Beefy" looked a bit like Pops and his Camaro. Barnes also identified Pops as the male figure in the drawing entitled "Nut and the Monster Beefy." Barnes additionally identified the car in the

drawing as Pops's Camaro with the IROC rims. Barnes identified the letters "Y.M.O." on the drawing of the forearm shooting a gun to mean "Young Mafia Organization," a group to which Barnes, Pops, Wilson, and Harris belonged. The parties stipulated that Pops had the letters "Y M O" tattooed on both of his forearms. As to the list of monikers, Barnes testified that the nickname "Nut" on the list was Pops, the nickname "Scrap" was Pops's brother Harris, the nickname "Bird" was Wilson, and the nickname "Smerf" was Barnes's own nickname.

The trial court did not abuse its discretion by concluding the writings were adequately authenticated. The purpose for which any writing is admitted "will determine what must be shown for authentication." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.) A trier of fact must be able to determine that a writing is what it appears to be. (*Ibid.*) " 'As long as the evidence would support a finding of authenticity, the writing is admissible.' " (*Ibid.*) Here, the location of the documents supported authentication: law enforcement officials found them in Wilson's residence. The content of the documents also supported authentication: they referenced Wilson, Pops, and other witnesses. Finally, Pops and Wilson were connected by circumstantial evidence. In addition to the documents' contents, Martin's and Barnes's testimony confirmed that the drawings depicted Pops, and the list referred to Pops, Wilson, Barnes, and Harris. (Evid. Code, §§ 1400, 1410, 1421.) Accordingly, we conclude the trial court did not err in finding the documents were properly authenticated.

Wilson next argues that the list of monikers and drawings constituted inadmissible hearsay because they were admitted for, and the prosecution sought to rely on, the truth of their implied incriminatory propositions. Our review "focuses on

whether the documents supported the nonhearsay purposes identified by the court and whether those purposes were relevant to an actual issue in dispute." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1204, quoting *People v. Armendariz* (1984) 37 Cal.3d 573, 585.)

When an out-of-court statement is offered for any relevant purpose other than to prove the truth of the matter stated, the statement is not hearsay. (*People v. Armstrong* (2019) 6 Cal.5th 735, 786.) Evidence is generally relevant if it " 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Riccardi* (2012) 54 Cal.4th 758, 815, quoting *People v. Garceau* (1993) 6 Cal.4th 140, 177.) Because otherwise relevant evidence not offered for its truth falls outside the hearsay rule entirely, the party offering that evidence is not required to demonstrate an exception to the hearsay rule to justify its admission. (*People v. Dalton*, *supra*, 7 Cal.5th at p. 232.)

Here, the court initially identified the nonhearsay purposes for admitting the writings as connecting Pops to Wilson's residence, associating Pops with Wilson, and associating both Pops and Wilson with Barnes and Harris to corroborate Barnes's testimony regarding his relationships with Pops, Wilson, and Harris. The court later confirmed the drawings and list were admissible for the limited purposes of connecting Pops to Wilson's home and to confirm their association. These nonhearsay purposes were relevant to establish identity — that is, that the alleged shooters, Pops and Wilson, had a relationship to each other. The existence of this relationship aided in demonstrating that the two men could have committed the crime together. What's more, the documents were relevant to establish a connection between Pops

and Wilson's residence because a nine-millimeter cartridge expended from the same firearm used in the murders was found at Wilson's residence. Barnes's testimony identifying Pops and his car in the drawings, as well as his testimony about the monikers of all four men, further corroborated these various connections and relationships. Thus, the trial court did not err by concluding the evidence supported the nonhearsay purposes for which it was admitted and those purposes were relevant to issues in dispute.[16] (*People v. Bunyard, supra*, 45 Cal.3d at p. 1204.)

Wilson argues that our decision in *People v. Lewis* (2008) 43 Cal.4th 415 (*Lewis*) renders the evidence inadmissible. In *Lewis,* we held that caricature drawings found in the defendant's residence depicting a sawed-off shotgun were hearsay because they were offered for the truth of the assertion that the defendant committed robberies with a sawed-off shotgun. (*Id.* at p. 498.) We concluded that because no exception to the hearsay rule justified their introduction, the court erred by admitting them. (*Ibid*.) The erroneous admissions,

---

[16] Because the evidence was admitted for nonhearsay purposes, defendant's argument that its admission constituted a violation of his confrontation rights is unavailing. "Whether a challenged statement is hearsay is always the threshold question." (*People v. Turner* (2020) 10 Cal.5th 820, fn. 19.) "[T]he confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984.) The evidence was neither hearsay nor testimonial; accordingly, no violation of defendant's confrontation rights could have occurred.

however, did not prejudice the defendant because the drawings added "next to nothing to the evidence of defendant's guilt of the crimes . . . ." (*Id.* at p. 499.) *Lewis* does not inform our analysis here because the list of names and the drawings found in Wilson's home, unlike the drawing found in *Lewis*, were not offered for their truth. Had these names been offered to demonstrate that Pops possessed the weapon he was depicted holding, our analysis might be different. But that is simply not the case; the list and drawings were instead offered for the nonhearsay purpose of identity, that is, establishing a relationship between Pops and Wilson, and connecting Pops to Wilson's residence.

In any event, were we to have found error in the trial court's admission of the list and drawings, it would have been harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Substantial evidence of Wilson's guilt and the connection between Wilson and Pops was introduced, including the nine-millimeter round found in Wilson's home that matched the expended casings found at the scene, evidence that Pops placed onto his car the IROC rims from the El Camino Wilson stole, Barnes's testimony that he was friendly with Pops and Wilson, and his testimony that he assisted with burning the El Camino following the murders. Like the drawing in *Lewis*, the writings introduced here added "next to nothing to the evidence of [Wilson's] guilt of the crimes." (*Lewis*, *supra*, 43 Cal.4th at p. 499.) Any error in their admission would have been harmless.

## III. JURY MISCONDUCT

Wilson asserts the trial court erred by denying his motion for new trial based on alleged juror misconduct. He claims that

Juror No. 9 committed misconduct by failing to disclose her prior jury service, and the court's denial of his new trial motion based on that misconduct was error. Wilson further alleges the trial court abused its discretion by failing to adequately investigate claims of juror misconduct he raised in his new trial motion, despite holding an evidentiary hearing to address those claims, by not calling more jurors to testify, not sufficiently questioning those who did, and not permitting defense counsel to examine the jurors. For the reasons that follow, we conclude these claims lack merit.

## A. Juror No. 9's Recollection of Prior Death Penalty Jury Experience

### 1. Background

Juror No. 9, a 35-year-old law firm docket clerk, stated in her jury questionnaire that she had served as a juror in a civil matter in 1992. She failed, inadvertently, to note her earlier experience as an alternate on a murder trial. Question 40A asked prospective jurors to identify whether they had "been a juror in the past," and, if so, to list the year the trial occurred, whether it was civil or criminal, the nature of the charge, and whether a verdict had been reached. Juror No. 9 listed a 1992 personal injury trial on which she had served as a juror but listed no other cases.

During voir dire, Juror No. 9 was questioned exclusively about her views on, and ability to impose, the death penalty. She indicated she could impose the death penalty if appropriate and would evaluate the evidence — even if emotional — before deciding upon the appropriate penalty. The prospective juror in the number 12 position, who was examined shortly before Juror No. 9, responded to questions about her prior service as an

alternate juror on a death penalty case. Later that afternoon, following a break and additional questioning, Pops and Wilson utilized a joint peremptory strike to excuse the prospective juror in the number 12 position, which occurred in front of Juror No. 9. Juror No. 9 was empaneled and served on Wilson's jury.

Following the death verdict, defense counsel conducted interviews with jurors. In her interview, Juror No. 9 told counsel she wanted to put the experience of serving as a juror on Wilson's case behind her "because it seemed to be lingering on and on, and she had been through this experience before," having served on a death penalty case many years earlier. This conversation marked the first time she alerted anyone involved with this case to the fact that she newly recalled her prior jury service. In a phone call with defense counsel a few days later, Juror No. 9 clarified she was as an alternate juror on a murder trial, and that it may have been a juvenile, not capital, case. Juror No. 9 said it was difficult to remember the details of the case because it had occurred some 15 years prior to Wilson's trial.

Defense counsel sought a court order of Juror No. 9's jury service records. The records indicated that between 1985 and 1999, Juror No. 9 had served on two trials, a 1993 matter and Wilson's trial — consistent with her questionnaire responses. No records were maintained regarding jury service predating 1985; the murder trial on which Juror No. 9 served as an alternate took place in 1984.

Wilson moved for a new trial, arguing Juror No. 9 committed misconduct by intentionally concealing her prior service on a murder case. On March 24, 2000, the court conducted an evidentiary hearing regarding the alleged juror

misconduct.[17]  Juror No. 9 testified that she had told defense counsel, during their post-trial interview, that she had served on a prior death penalty case as an alternate juror.  She did not list her prior service in her juror questionnaire because she "had just forgotten about it."  She said the questionnaire was "lengthy" and she "was trying to get through it," noting she simply did not recall her prior service when filling it out.  She also did not mention her prior service during voir dire, although she was not asked about it, despite another prospective juror discussing their prior service as an alternate on a capital trial, who was subsequently peremptorily excused.  Juror No. 9 testified that she had remembered her prior service "months . . . or weeks into" Wilson's trial, and certainly after the jury began hearing evidence.  When the court asked her why she did not report her prior service once she remembered it, she explained she "just really honestly didn't think about it."

Wilson's attorney argued at the evidentiary hearing that Juror No. 9's failure to disclose her prior service at any point during the trial constituted "a concealment of a very material fact."  When the court pressed counsel on whether he was asserting Juror No. 9 had lied when she gave testimony before the court, Wilson's counsel clarified that he did not believe Juror No. 9 was being untruthful, and his use of the word "concealment" was a "term of art."  The court found Juror No. 9 "very credible" and did not believe she "intentionally concealed anything."  The questionnaire's phrasing regarding prior

_____

[17]   Wilson's counsel unsuccessfully sought the court's permission to examine jurors, including Juror No. 9, at the hearings related to the alleged misconduct.  The trial court ruled it would be the exclusive questioning body, but requested "counsel . . . make any suggestions for the scope of the inquiry."

service, the court noted, was not altogether clear as to whether service as an alternate should have been included.[18]

The court continued the matter to conduct further research and heard argument again on April 7, 2000. Following that second hearing, the court denied the new trial motion, reiterating its finding that Juror No. 9 was "credible." The court explained that Juror No. 9's prior service was 15 or 16 years before Wilson's trial, it was unclear whether that service was on a juvenile matter or a death penalty matter, and in any event the fact she was an alternate made her service "a lot easier to forget" because she was not involved in rendering a verdict. Although Juror No. 9 recalled at some point during the trial that she had this prior experience, the court concluded nothing in the questionnaire or the jury's instructions would have alerted her that she was obliged to bring it up. Finally, the court concluded that Juror No. 9's inadvertent omission did not constitute actual bias under *In re Hamilton* (1999) 20 Cal.4th 273.[19]

### 2. Discussion

Wilson argues Juror No. 9 committed misconduct by intentionally concealing her prior service on a murder trial's

---

[18] Specifically, the questionnaire stated: "If you have been a juror in the past, please provide the following information," and listed categories including year of the case, whether it was civil or criminal, the charges (if criminal), the type of case (if civil), and whether a verdict was reached.

[19] In *In re Hamilton*, we explained "that an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias. Moreover, the juror's good faith when answering voir dire questions is the most significant indicator that there was no bias." (*In re Hamilton*, *supra*, 20 Cal.4th at p. 300.)

jury once she remembered it during his trial. "The law concerning juror concealment is settled. . . . '[An] accused . . . has a constitutional right to a trial by impartial jurors. [Citations.] " ' "The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution." ' " ' " (*In re Manriquez* (2018) 5 Cal.5th 785, 797 (*Manriquez*).) If a juror actively conceals factual information or falsifies voir dire responses, the process of selecting jurors is undermined. (*Ibid.*) Wilson argues Juror No. 9's failure to list her prior jury service in the questionnaire, disclose it during voir dire, or — in particular — bring it to the court's attention once she remembered it — constituted intentional concealment.

While intentionally concealing juror information may be sufficient to demonstrate bias warranting disqualification, a juror's " 'inadvertent or unintentional failure[] to disclose' " information is treated differently. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 644 (*San Nicolas*).) In the case of unintentional failure to disclose, the trial court evaluates whether a juror is so biased that they cannot perform the duties required of them. (*Ibid.*) We accord deference to any credibility determination made by the trial court in its evaluation of concealment. (*Id.* at p. 646.)

Wilson suggests that because Juror No. 9 executed her questionnaire under penalty of perjury — which attaches serious consequences to lies and omissions, and because the questionnaire asked about her prior jury service, her failure to disclose that prior service *at any point in the trial* constituted concealment demonstrating bias. The trial court found Juror No. 9 credible when she testified that she did not remember her prior jury service when completing her questionnaire or

responding during voir dire. It also found credible that she was not aware she should alert the court when she recalled her prior service mid-trial. Wilson argues these credibility findings should be discounted because the conclusion was made with respect to whether she recalled her prior service at the time she completed the questionnaire, not as to whether she was credible about why she failed to disclose it later. The record does not support this assertion.

A trial court has the discretion to determine whether a juror's " 'failure to disclose is intentional or unintentional' " and whether the juror is biased. (*San Nicolas*, *supra*, 34 Cal.4th at p. 644.) Unless the record clearly demonstrates a juror's bias, the trial judge is best situated to evaluate a juror's intentions through the voir dire process. (*Ibid.*) The court expressly asked why Juror No. 9 did not report her prior service to the court once she remembered it, and she responded that she simply did not think to do so. The court found this testimony "very credible," and noted she was never instructed to bring to the court's attention something she remembered after completing her questionnaire or responding to voir dire. We accord this credibility finding deference, as well. (*Ibid.*)

Wilson argues that because Juror No. 9 failed to disclose her prior jury service, her inherently biased presence on the jury constituted a structural defect warranting reversal. He further contends that even if her failure to disclose her prior jury service only raised a presumption of prejudice, that presumption was not rebutted. Neither of these arguments is meritorious. While we have acknowledged that, "in a rare case, a court ultimately may determine that a juror's innocent concealment masked a substantial likelihood of actual bias," Juror No. 9's failure to disclose her prior service does not demonstrate such bias.

(*Manriquez*, *supra*, 5 Cal.5th at p. 798.)  In *Manriquez*, a juror failed to disclose in her questionnaire the fact that she suffered physical and sexual abuse as a child, despite the questionnaire inquiring about whether prospective jurors had been the victims of crimes.  (*Manriquez*, *supra*, 5 Cal.5th at pp. 793–794.)  After the trial, the juror voluntarily responded to a questionnaire, and in it she disclosed her childhood abuse to explain why she found the petitioner's mitigating evidence of abuse unpersuasive.  (*Ibid*.)  She later attested that she did not conceal her abuse in filling out her jury questionnaire, but did not believe it was responsive to questions because she thought the questionnaire pertained exclusively to her experiences as an adult.  (*Id*. at pp. 794–795.)

Following our order to show cause, the juror testified at a reference hearing that she had not thought the abuse or violence she suffered as a child was responsive to the questionnaire's inquiries about suffering violence or past criminal activity because she was a child when it occurred and such abuse was relatively normalized during the era in which she was raised.  (*Manriquez*, *supra*, 5 Cal.5th at pp. 796, 801.)  We concluded substantial evidence supported the referee's findings that the juror's nondisclosure was not intentional and did not indicate bias (*id*. at pp. 809–810), and independently concluded that although it constituted misconduct to fail to complete the questionnaire accurately, the juror was not actually biased (*id*. at p. 819).

In *San Nicolas*, a juror failed to disclose in his questionnaire and during voir dire that he had suffered prior arrests, had been falsely arrested, and had been the victim of a violent crime as a child.  (*San Nicolas*, *supra*, 34 Cal.4th at pp. 644–646.)  The defendant moved for new trial on the grounds of

juror misconduct, an evidentiary hearing followed, and the trial court concluded the juror's failures to disclose the prior arrests and false arrest were "inadvertent or unintentional, and there was no resulting bias." (*Id.* at p. 645.) This conclusion was supported by substantial evidence, as was the court's conclusion that the juror's failure to disclose his status as victim of a violent crime was not deliberate and he was not biased. (*Id.* at pp. 645, 648.)

We likewise conclude here that Juror No. 9's failure to disclose her prior jury service on a murder trial, even if capital, did not demonstrate bias, and no misconduct occurred. Juror No. 3 had prior experience as a juror on a murder trial and Juror No. 2 had previously served on a jury in a drive-by shooting case with three victims. Wilson contends all jurors who had prior capital experience were excused from service via peremptory challenge. Whether Juror No. 9's undisclosed prior service was on a capital trial or a murder trial is beside the point; when assessing whether it is substantially likely a juror was actually biased, our inquiry is " 'not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias.' " (*Manriquez*, *supra*, 5 Cal.5th at p. 798.) Juror No. 9's inadvertent nondisclosure of her prior jury service did not evidence bias, and the trial court's denial of Wilson's new trial motion was not error.

## B. Trial Court's Alleged Failure to Investigate Juror Misconduct

In addition to the misconduct alleged regarding Juror No. 9's prior service, Wilson claims the trial court failed to conduct an adequate inquiry of alleged misconduct involving Juror Nos. 1, 6, 7, 10, 11, and 12, and remand is warranted to determine

the extent of the possible misconduct. We conclude the court's inquiry was adequate, and that the court did not abuse its discretion by denying the motion for new trial based on alleged misconduct.

### 1. *Background*

Following the death verdict, Pops's attorney, Jones, contacted jurors. One of the jurors complained, and the court ordered counsel to stop contacting jurors. Before the no contact order was issued, defense counsel's conversations with some jurors revealed a juror had discussed a publicized murder case during deliberations, which counsel contended constituted misconduct. Defense counsel asked the court to lift the no-contact order, and the People opposed their motion but urged the court to question jurors under oath to bring swift resolution to the misconduct allegation. The court did not lift the order, but it called Juror Nos. 6 and 7 to provide sworn testimony regarding attorney Jones's assertion.

Juror No. 7 testified that the penalty vote for Wilson had been split nine to three, with nine jurors voting for death and three for life. The court dismissed the jurors for a weekend, and upon returning they took an informal vote, revealing unanimity in favor of death. Those who had voted for life shared why their votes had shifted, and Juror No. 7 testified that Juror No. 6 told the others she had seen a news story over the weekend about a shooting in Atlanta that made her "take a closer look at the case that she was on," and "honestly in her mind" Wilson "deserved the death penalty." She had indicated when she voted for life the week before that her vote had been wavering.

Juror No. 7 testified that he thought the jurors followed the instructions at all times, and that the discussion regarding

the Atlanta crime occurred only after the poll indicating the verdict was unanimous had occurred. Juror No. 7 recalled that Juror No. 12 had also voted for life the week before, believing it to be a harsh enough form of punishment, but Juror No. 7 also thought Juror No. 12 would vote with the majority. Juror No. 7 testified that all of the jurors, including Juror No. 12, exercised independent judgment in voting, rather than blindly following the majority; Juror No. 12 actively deliberated and analyzed the issues.

Juror No. 6 also testified. She confirmed a unanimous poll was taken after jurors returned from the weekend, and that some of the jurors who formerly voted for life discussed why their votes had changed. She remembered addressing her changed vote, but she did not recall exactly what she said, and did not remember mentioning the Atlanta crime that day. She testified that she had read an Internet article and watched a news program about the Atlanta shootings, and remembered that the jurors had a discussion about that crime generally, but she did not know precisely when that conversation occurred. When asked whether she was emotionally affected by the Atlanta shootings, Juror No. 6 testified that she was an emotional person and tended to dwell on things like the Atlanta shooting "every time something like that happens," but that the emotional impact of that crime had dissipated for her before jurors completed the poll and reached the ensuing penalty verdict.

After it heard testimony from Juror Nos. 6 and 7 and argument from the parties, the court sought testimony from Juror No. 12, as well. Juror No. 12 confirmed that before the jurors departed for the weekend the vote had been nine to three, and he was one of the three jurors who had voted for life. He

believed the poll taken when jurors returned after the weekend was still nine to three, and he said he would vote with the majority if 11 jurors voted for death. Juror No. 12 eventually changed his vote, but did so not simply to go along with the majority; he testified that the heinous nature of the crime and his own "scrupulous[]" evaluation of witness testimony ultimately changed his mind. He did not recall which other jurors initially voted for life, except that they were both female. He did not recall a discussion regarding the Atlanta crimes and testified that it was not a factor affecting his deliberative process.

After Juror No. 12 testified, defense counsel persisted in requesting the court grant the parties permission to contact jurors. The court ultimately agreed to send a letter to jurors asking if they would consent to contact, and following receipt of consent from several jurors, the court continued the new trial motion to provide defense counsel an opportunity to contact those jurors who had responded.[20]

Pops's attorney, Jones, contacted Juror No. 1, who told her that Juror Nos. 6 and 12 had initially voted for life but their votes changed in the poll immediately following the jurors' return from the weekend. Juror No. 1 told Jones that there was a conversation amongst jurors following the poll during which jurors discussed the Atlanta crimes. Juror No. 6 purportedly said she believed she needed to put her sympathy for Wilson's family aside after hearing news about the Atlanta crimes; Juror No. 10 purportedly said his country of origin taught that "[i]f you

---

[20] It was at this juncture that defense counsel spoke with Juror No. 9 and learned of her prior jury service, as previously addressed.

kill someone, then you are killed"; Juror Nos. 10 and/or 11 purportedly asked the jurors why Pops and Wilson should sit in prison while they — the citizens — paid for it; and, Juror No. 12 said he was "comfortable" with voting for life or for death. Jones reported that Juror No. 1 initially agreed to sign a declaration attesting to these impressions, but after relations between Jones and Juror No. 1 soured, Juror No. 1 ultimately indicated she did not want to be contacted again, and she did not sign a declaration. Jones submitted a declaration attesting to her conversation with Juror No. 1 regarding the juror's conversation with fellow jurors. The trial court declined to obtain Juror No. 1's testimony, because "this juror . . . is, obviously, very reluctant." The trial court also declined to call Juror Nos. 10 or 11 to testify because there was no evidence their alleged statements "were anything other than transitory comments in passing, provoking no discussion by other jurors."

Pops's motion for new trial, joined by Wilson, argued that Juror No. 12 committed misconduct by siding with the majority instead of weighing the evidence. In the alternative, they argued Juror No. 12 relied on evidence outside of the case, namely Juror No. 6's statements concerning the Atlanta crime — which constituted misconduct because it violated his oath as a juror. They argued Juror No. 6 likewise committed misconduct by relying on information about the Atlanta crime to reach a verdict. Defense counsel objected to the court's refusal to allow them to question the jurors, claiming the court's questioning was leading and permitted the jurors to deny misconduct.

The court concluded Juror No. 6 had not deliberated over the weekend before her vote changed, and noted jurors necessarily thought about the case during their non-deliberative

76

time. Wilson claims — incorrectly — that the court did not expressly rule on his motion for new trial, but at a hearing on April 7, 2000 — during which Juror No. 9's alleged misconduct was addressed — the court stated it was "prepared to deny all the motions." On that same day, the trial court denied the outstanding motions for new trial, including those related to Juror Nos. 6, 9, and 12.

### 2. *Discussion*

Wilson contends the trial court failed to adequately investigate his allegations of juror misconduct by not exercising its discretion to permit the parties to call and question jurors at the hearings on his motions for new trial. We conclude this claim lacks merit. A trial court has broad discretion to resolve a motion for new trial. (*People v. Manibusan* (2013) 58 Cal.4th 40, 52 (*Manibusan*).) While "a new trial may be warranted if a jury engages in misconduct that prevents impartial consideration of the case," the trial court is obliged only "to ' " 'make whatever inquiry is reasonably necessary' " to resolve the matter.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 517 (*Mora and Rangel*).) When the allegations of misconduct are based on the hearsay assertions of counsel — as with Jones's declaration pertaining to Juror No. 1's alleged statements — we have held that evidence " 'insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an evidentiary hearing.' " (*Ibid.*)

The trial court fulfilled its obligation in this case by conducting several hearings to determine whether misconduct occurred. After hearing testimony from Juror Nos. 6, 7, and 12, the trial court found no misconduct. It was under no obligation to obtain testimony from every juror, and no error resulted from

its decision not to obtain testimony from Juror Nos. 1, 10, or 11. As to Juror No. 1, the only basis to conduct a further inquiry was Jones's statement regarding their phone conversation. This evidence was hearsay; accordingly, no error followed from the trial court's decision not to hold an evidentiary hearing or by denying the new trial motion. (*Mora and Rangel, supra*, 5 Cal.5th at p. 517.) We might likewise conclude no abuse of discretion resulted from the trial court's conclusion that Juror No. 6 did not commit misconduct (see *ibid.*), although that is not Wilson's assertion.

Instead, Wilson claims the court erred by not adequately investigating the alleged misconduct. This assertion is both unfounded — the court conducted multiple evidentiary hearings — and unavailing; the basis for the alleged misconduct related to Juror No. 6 was a hearsay statement made by defense counsel. We have made clear that "[a] court must hold an evidentiary hearing on alleged jury misconduct only when the defendant shows 'a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " (*Manibusan, supra*, 58 Cal.4th at p. 55.) No such conflict existed here. To the extent Wilson presented evidence intimating jurors were influenced by matters outside the record, the court's evidentiary hearing resolved that concern. "As we have explained, deliberating jurors 'may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny.' " (*Id.* at p. 53.) Once the trial "court is satisfied that the juror in question 'is participating in deliberations and has not expressed an intention to disregard

the court's instructions or otherwise committed misconduct,' " the court is not obliged to conduct further inquiry. (*Ibid*.) After conducting multiple hearings, the trial court was satisfied that the deliberations were not tainted by misconduct, and its denial of Wilson's new trial motion did not constitute an abuse of discretion. (*Ibid*.)

In an effort to avoid this conclusion, Wilson's argument is not that the denial of the new trial motion or failure to hold a hearing constituted an abuse of discretion, but rather that the court erred by failing to permit him to interview jurors. Wilson asserts that "[t]he testimony of the jurors was a poor substitute for the interviews the attorneys were asking to do" because the court's hearings did not "clear up the facts" to his satisfaction. This argument lacks merit. Trial courts are under no obligation to conduct evidentiary hearings at all when the allegations of misconduct are based on hearsay, as was the case here, and are certainly not required to permit the parties — rather than the court — to examine witnesses. (*Mora and Rangel, supra*, 5 Cal.5th at p. 517.)

To the extent Wilson is claiming error arose from the court's refusal to grant him access to jurors outside of the courtroom, the argument is even less persuasive; such interviews would have, at best, resulted in unsworn hearsay statements alleging misconduct occurred. Even if those statements had been obtained, the court would have committed no error in declining to do the very act that occurred here — conduct an evidentiary hearing. (See *Mora and Rangel, supra*, 5 Cal.5th at p. 517.) The court did conduct a hearing, and determined no misconduct occurred. This decision was " 'within the sound discretion of the trial court,' " and the trial " 'court d[id] not abuse its discretion simply because it fail[ed] to

investigate any and all new information . . .’ ” or allegations raised by Wilson.  (*Manibusan, supra*, 58 Cal.4th at p. 52.)

## IV.  PENALTY PHASE

### A. Constitutionality of California’s Death Penalty Statutory Scheme

Wilson raises several objections to the constitutionality of California’s death penalty scheme.  We decline to reconsider our existing precedent and reject these objections, on the merits, as follows:

The special circumstances qualifying a defendant for the death penalty, as set out in section 190.2, are not unconstitutionally overbroad, nor are they so numerous that the constitutionally required narrowing function cannot be performed.  (*People v. Bell* (2019) 7 Cal.5th 70, 130; *People v. Williams* (2010) 49 Cal.4th 405, 469.)

There is no basis in our precedent to conclude that a trier of fact imposes the death penalty in an arbitrary or capricious manner when the trier of fact considers the circumstances of the crime under section 190.3, factor (a).  (*People v. Fayed* (2020) 9 Cal.5th 147, 213.)

We have previously held that the death penalty is not unconstitutional “ ‘ “for failing to require proof beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and render death the appropriate punishment.”  [Citation.]’ ”  (*People v. Henriquez* (2017) 4 Cal.5th 1, 45.)  We also have consistently held the death penalty does not constitute an increased sentence.  (*People v. Scott* (2015) 61 Cal.4th 363, 407.)  And we have determined that these conclusions are unaltered by *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, *Blakely v.*

*Washington* (2004) 542 U.S. 296, or *Cunningham v. California* (2007) 549 U.S. 270. (*People v. Scott, supra*, 61 Cal.4th at p. 407.)

Defendant does not give us any reason to revisit these issues or to find that California's capital punishment scheme violates the Eighth Amendment's prohibition against cruel and unusual punishment, or the Fourteenth Amendment's guarantee of due process does not require the jury find unanimously and beyond a reasonable doubt that aggravating factors outweigh mitigating factors. (*People v. Jones* (2017) 3 Cal.5th 583, 618–619.) Nor does defendant give us any reason to depart from our precedent holding that the death penalty statutory scheme is not rendered infirm under the federal Constitution by failing to demand written findings or unanimity as to the existence of particular aggravating factors. (*People v. Lopez* (2018) 5 Cal.5th 339, 370; *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 326.)

There is no requirement that the jury be instructed concerning burden of proof at the penalty phase, nor must it be instructed on a " ' " 'presumption of life' " ' " to satisfy a defendant's constitutional rights to due process, equal protection, a reliable determination of sentence, or freedom from cruel and unusual punishment. (*People v. Fayed, supra*, 9 Cal.5th at p. 213.)

Nor does the use of unadjudicated offenses under section 190.3, factor (b) constitute a violation of due process principles. (*People v. Fayed, supra*, 9 Cal.5th at p. 214.) Section 190.3's use of the word " 'extreme' . . . in the list of mitigating factors . . . does not act as a barrier to the jury's consideration of mitigating

evidence in violation of the federal Constitution." (*People v. Mitchell* (2019) 7 Cal.5th 561, 588.)

The phrase " ' " " 'so substantial' " ' " — when used to compare mitigating and aggravating factors — does not render CALJIC No. 8.88 unconstitutional. (*People v. Landry* (2016) 2 Cal.5th 52, 123.) Nor is the instruction " ' "unconstitutional for failing to inform the jury that: . . . death must be the appropriate penalty, not just a warranted penalty." ' " (*People v. Mitchell*, *supra*, 7 Cal.5th at p. 589.) Error does not "flow[] from a failure to instruct the jury that if mitigating factors outweigh aggravating factors, life is the appropriate sentence." (*Mora and Rangel*, *supra*, 5 Cal.5th at p. 519.)

The trial court was not obliged to provide a jury instruction indicating it was a defendant's burden to demonstrate factors in mitigation were present, nor did the court need to instruct the jury it was required to unanimously find any mitigating factor was present. (*People v. Jones*, *supra*, 3 Cal.5th at p. 620.)

"The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating factors." (*People v. Mitchell*, *supra*, 7 Cal.5th at p. 589.) There is likewise no requirement "that the court designate which factors are aggravating or mitigating or instruct the jury that certain factors are relevant only in mitigation." (*People v. Winbush* (2017) 2 Cal.5th 402, 490.)

The federal Constitution does not require intercase proportionality review, assessing the relative culpability of a defendant's case compared to other murders. (*People v. Bell*, *supra*, 7 Cal.5th at p. 131.) " 'The capital sentencing scheme does not violate equal protection by denying to capital

defendants procedural safeguards that are available to noncapital defendants.' " (*People v. Frederickson, supra*, 8 Cal.5th at p. 1027.) Defendant does not present a persuasive argument that international law prohibits application of the death penalty in this case, or in the United States. This country reserved the right to impose the death penalty when it signed the International Covenant on Civil and Political Rights. (*People v. Capers* (2019) 7 Cal.5th 989, 1017.)

### B. Cumulative Error

Wilson contends the combined guilt and penalty phase errors require reversal of his conviction and death sentence, even if the errors are not prejudicial when considered individually. We have found no error, so no prejudice can accumulate.

## V. DISPOSITION

We affirm the judgment.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**KRAUSE, J.**[*]

_____

[*] Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Wilson

_____

<u>**Procedural Posture**</u> (see XX below)

**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S087533
**Date Filed:** April 12, 2021

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Curtis B. Rappe

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, Joseph E. Chabot, Ryan R. Davis and Elias Batchelder, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters and James William Bilderback II, Assistant Attorneys General, Jaime L. Fuster and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ryan R. Davis
Deputy State Public Defender
770 L St., Suite 1000
Sacramento, CA 95814-3362
(916) 322-2676

Douglas L. Wilson
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6184