Filed 12/27/23  In re D.H. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re D.H., a Person Coming Under the Juvenile Court Law. | C097802 |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>   v.<br><br>D.H.,<br><br>        Defendant and Appellant. | (Super. Ct. No. JV141779) |

Minor D.H. appeals from the disposition order entered by the juvenile court related to his sexual assault of a female victim.  He argues the juvenile court erred in denying his motion to exclude evidence that the victim identified him prior to trial in what he characterizes as an unduly suggestive photographic lineup.  We will affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Assault*

On November 26, 2020, the victim (who was 57 years old at the time of the October 2022 jurisdiction hearing) spent over seven hours eating Thanksgiving dinner with friends at a local cocktail lounge.  During her time at the lounge, she had about six to seven alcoholic drinks.  A friend drove her home around 9:30 p.m.

When she got home, she realized she had left her house keys in her car, which she had left parked at the lounge.  She did not have her cell phone with her, so she decided to make the 45-minute walk back to her car to retrieve her house keys.

After walking for about 40 minutes, the victim tripped and fell into some gravel.  During the fall, she dropped her car key.  She looked for about 30 minutes but could not find it.  She saw a man nearby, who she later identified as D.H., and asked if she could use his cell phone.  A nearby streetlight helped her see his face.  D.H. initially said he did not have a phone, but he returned after a few minutes and said she could use his phone at his house, which was nearby.  The victim agreed and followed D.H.

When they arrived at D.H.'s home, D.H. and the victim went inside but the door was left partially open.  D.H. retrieved a phone from a different room, and the victim called her adult son, who agreed to pick her up at a nearby fast food restaurant.  The victim returned the phone to D.H. and headed to the door.  Suddenly, D.H. forcibly kissed her on the mouth.  The victim tried to pull away, but D.H. shoved his hand down her shirt and grabbed her breast.  At one point, D.H. exposed his erect penis and forced the victim to touch it.  The two struggled as the victim tried to leave, and D.H. shoved her to the floor.  Ignoring the victim's pleas to stop and let her go, D.H. shut the front door and tried to lock it.  The victim, who suffered bruises during the incident, eventually escaped out of the front door and ran.

As she fled, the victim had to slow down to catch her breath, and D.H. approached her from behind.  The victim felt the pressure of a hard object being pressed into her

2

lower back, which she feared was a weapon. The victim recognized D.H.'s voice as he warned her that she had "better keep [her] fuck'n mouth shut." "Terrified," the victim stood still for a bit but then started walking forward again. When she finally got the courage to look back, no one was there.

The victim fled to the nearby restaurant and met her son. The son helped the victim retrieve her keys and took her home. Later that morning, the son obtained the attacker's phone number from his phone, and he drove her by the attacker's house so she could confirm the address.

The victim called the police later that morning but a detective did not interview her until about three months later in February 2021. She initially told the detective she did not know for sure if she would be able to recognize the man who assaulted her. She also said she had been intoxicated at the time of the attack, and her recollection of events was "blurry." But, she gave the detective D.H.'s phone number and address. The detective and other officers confirmed that D.H. had previously been associated with that address and phone number.

In May 2022, the victim identified D.H. as her attacker in a six-pack photographic lineup. During the jurisdiction hearing, the victim testified she was "sure" about her identification of D.H. during the lineup — "it was an instant recognition" when she saw the picture. Although there had been another individual in the photographic lineup with similar features, he was not the man who assaulted her. In addition, she was "sure" at the time of trial that D.H. was her attacker. She described her attacker as a Black male in his "late teens to early 20s," wearing a baggy sweatshirt and jeans, with his hair in "chunks" or "twists," and approximately her height (five feet eight inches tall). D.H. was approximately five feet five inches tall.

B.    *Wardship Petition, Jurisdiction Hearing, & Disposition Hearing*

A wardship petition was filed against D.H. alleging he committed sexual battery (Pen. Code, § 243.4, subd. (a); count one),[1] false imprisonment (§ 236; count two), dissuading a witness (§ 136.1, subd. (a)(1); count three), and misdemeanor indecent exposure (§ 314, subd. (1); count four).  At the contested jurisdiction hearing in October 2022, the juvenile court sustained all counts.  During the December 2022 disposition hearing, the court adjudged D.H. to be a ward of the court and placed him on probation.

C.    *Motion to Exclude the Photographic Lineup Identification*

Prior to the jurisdiction hearing, D.H. filed a motion to exclude the victim's identification of him in the photographic lineup.  D.H. argued the lineup was impermissibly suggestive and insufficiently reliable, which violated his due process rights and tainted any subsequent identifications of him.  The prosecution opposed the motion, arguing the lineup procedure was not unduly suggestive and the identification was reliable under the totality of the circumstances.  The prosecution attached a transcript of the victim's 911 call in November 2020 reporting the incident, a transcript of the victim's interview with the detective in February 2021, a transcript of a phone call between the victim and the detective scheduling an appointment for her to look at the photographic lineup, and a copy of the photographic lineup from May 2022.

During the 911 call made in November 2020, the victim described her attacker as Black, in his late teens to early 20's, and a "little bit" shorter than her.  It was difficult for her to gauge his build because he had been in a "baggy" sweatshirt and "baggy" jeans.  She provided D.H.'s phone number, which she had retrieved from her son's phone.  She also provided the address where she had been attacked.  She also stated she had been drinking.

---

[1] Undesignated statutory references are to the Penal Code.

4

During the February 2021 interview, the detective allowed the victim to review the statement she had given in November 2020. The detective asked if she wanted to change anything, and she said no. The detective then told the victim he had done some research and found that the phone number provided by the victim matched up with the address she gave. He said, "I think I know who [the attacker] is." He said the suspect was 15 years old, and 14 years old at the time of the incident, and the victim responded, that was "[a] little younger . . . than I thought" and she was "way off on age." The victim described the incident and said she had seen her attacker's face, "but it was dark." Although the victim could not clearly picture the face in her mind during the interview, the attacker had "chunky hair."

The detective then explained the next steps, including talking to any witnesses and the suspect. He lamented that no DNA had been collected after the incident. He explained it would ultimately be up to the prosecutor as to whether any case would be filed. The detective explained the phone number would corroborate that the suspect was involved in the crime and that he would continue investigating the suspect. The victim asked if a positive identification would be necessary, and the detective responded yes. The victim said it sounded like the detective knew who the attacker was, but the issue now was "whether we can prove it." The detective responded that he would need her to at least try to identify the suspect. Although he normally would do that with a photographic lineup, this would be more challenging here since the suspect did not have a driver's license.

During the October 2022 hearing on the motion to exclude the identification, the detective testified that he had identified D.H. as the suspect based on the phone number provided by the victim. However, he did not attempt to have the victim identify D.H. during their February 2021 interview because he did not have a photo of D.H. The detective refrained from sending the case to the prosecutor, in part because he preferred to wait for the victim to identify her attacker.

5

By May 2022, the detective had obtained a booking photo of D.H. and he asked the victim if she would participate in a photographic lineup. He mentioned that they would have to try an identification before sending anything to the prosecutor. The victim agreed to "try," but seemed uncertain because the attacker could have changed his appearance, her memory was fading, and it was dark at the time of the attack. The detective said, "if you can't identify the person, that doesn't stop me from doing what I need to do." The detective had the suspect's phone number and address. Still, the suspect had "done some other stuff" (including improperly having a gun) and was currently on an ankle monitor. The detective warned the suspect was going down a "path" and was "starting his criminal career." The victim agreed, saying she would "do [her] best."

The detective had prepared over 300 photographic lineups throughout his career, and he looked for five "filler" pictures that were "similar" to D.H., including hairstyle, skin tone, age, and facial hair. Including D.H., the individuals in the lineup were between 15 to 18 years old. And since the victim had stressed she remembered D.H.'s "chunky" hairstyle, the detective picked five fillers that would match D.H.'s dreadlock hairstyle. Four of the six individuals (but not D.H.) had some sort of facial hair, and two of them (including D.H.) wore a white T-shirt. Since the officer only had a booking photo for D.H., all the others were also booking photos.

During their May 2022 meeting, the detective admonished the victim that her attacker might not be in the lineup, she was not obligated to pick anyone, she should take her time in picking someone, and features could change. The detective avoided interacting with her while she spent about 15 minutes reviewing the photos. She eliminated four of the photos and then picked out D.H.'s photo from the remaining two. The detective thanked the victim for her time but did not say anything substantive, including whether she had picked the "right" suspect.

6

D.H. argued the lineup procedure was unduly suggestive because the detective had told the victim that the suspect had a case pending and a booking photo. The detective also said the suspect was 14 years old, which would lead the victim to select from the two individuals who did not have facial hair. And the detective said the photo was a booking photo, which would lead the victim to select from the individuals who were wearing white or plain T-shirts. D.H. also questioned the victim's credibility, noting that she had commented to investigating officers that she might not be able to identify her attacker. In addition, the photographic lineup was more than 18 months after the incident. Finally, the detective had failed to comply with the guidelines set out in section 859.7.

The court denied the motion, finding that the lineup was not unduly suggestive. The lineup contained six Black males who appeared to be of similar age and each wore his hair in braids. Although four had some facial hair while two did not, they were all of similar build and were photographed with the same background. In the court's opinion, D.H.'s photo "does not impermissibly 'stand out.' " Although some of the individuals were wearing white T-shirts, which is common in juvenile hall, all were wearing T-shirts, and there was nothing to suggest that the victim knew the significance of wearing a white T-shirt. Under the circumstances, D.H. had failed to demonstrate that the photographic lineup was improperly or unduly suggestive.

DISCUSSION

D.H. contends his right to due process was violated by the introduction of the victim's identification. As our Supreme Court recently explained, "[a] violation occurs ' "only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " ' [Citation.] If we determine the procedure was suggestive, no due process violation arises if ' " 'the identification itself was nevertheless reliable under the totality of the circumstances.' " ' [Citations.] In assessing the totality of the circumstances, we consider ' "such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's

degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." [Citations.] "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." ' " (*People v. Wilson* (2021) 11 Cal.5th 259, 283.) A defendant's argument that an "identification procedure was unduly suggestive is a 'mixed question of law and fact.' " (*Ibid.*)

According to D.H., the detective's conduct rendered the identification unduly suggestive. D.H. points to the detective's statement that he knew her attacker's identity, and the attacker was 14 years old. In addition, D.H. argues in mentioning that he had been booked on another charge, the detective was suggesting that the victim "could do her civic duty by choosing the person that [the detective] *knew* had committed the crime." Finally, according to D.H., the detective made the victim feel like her identification was necessary for any arrest. D.H. also argues the photographic lineup itself was unduly suggestive since his photo was one of only two booking photos (as indicated by the plain T-shirts) and one of only two that showed men without facial hair. According to D.H., this caused his photo to stand out in a way that would suggest the victim should select him. D.H. argues the lineup procedure failed to comply with the regulations required under section 859.7.[2]

D.H. also challenges the reliability of the identification, given that it was dark and the victim was intoxicated at the time of the incident, which happened quickly. D.H. points to the victim's confusion regarding the attacker's age and build, and her statement

---

[2] Section 859.7, enacted by Senate Bill No. 923 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 977, § 2), requires law enforcement agencies to adopt regulations for conducting photographic and live lineups to ensure their reliability and accuracy, and sets forth various minimum requirements for lineups.

that she might not be able to identify the attacker. D.H. also notes that the identification happened 18 months after the incident, and the victim spent 15 minutes looking at the photos.

Despite D.H.'s contentions, neither the detective's conduct nor the photographic lineup itself was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Although the detective mentioned he had identified a suspect, and that the suspect had been booked on other charges, he never named the suspect or gave any identifying information, other than D.H.'s age at the time of the attack. Moreover, D.H. was not singled out by the mere fact that the detective had a suspect in mind since it would have been impossible to put together a six-pack photographic lineup without an identified suspect. Although the detective mentioned he needed the victim to try to identify her attacker, he also assured that, if she was unable to do so, "that doesn't stop me from doing what I need to do." He reminded the victim that they could link the suspect to the crime with the phone number and address she had provided. In addition, before showing the victim the photographic lineup, the detective admonished the victim that her attacker might not be in the lineup, she was not obligated to pick anyone, she should take her time in picking someone, and features could change. The detective avoided interacting with the victim while she reviewed the photos, and he did not indicate whether she had picked the "right" suspect in the end.

We also find no merit in D.H.'s contentions regarding the actual photographic lineup. The individuals in the photos were of a similar age, had a similar build, and wore their hair in braids. Although four had some facial hair, the victim had never focused on that feature when talking to the detective. Indeed, the victim even mentioned to the detective that the suspect might have changed his appearance. In addition, all of the photos were booking photos, and nothing in the record suggests that the victim would have focused only on the two individuals wearing white T-shirts. To the extent the lineup

9

occurred 18 months after the incident, this does not in itself make the lineup impermissibly suggestive.

Although the lineup procedure may not entirely comport with the standards set out in section 859.7, D.H. provides no authority for his argument that such a lack of compliance requires us to conclude that *this* lineup was impermissibly suggestive. We note that section 859.7 makes clear that "[n]othing in this section is intended to preclude the admissibility of any relevant evidence or to affect the standards governing the admissibility of evidence under the United States Constitution." (§ 859.7, subd. (d).)

Given our conclusions, we need not address the second prong of the test, namely whether the identification itself was nevertheless reliable under the totality of the circumstances.

DISPOSITION

The juvenile court's order is affirmed.

/s/
BOULWARE EURIE, J.

We concur:


/s/
HULL, Acting P. J.


/s/
MESIWALA, J.

10